GRAMEX CORPORATION,
Respondent,

v.

GREEN SUPPLY, INC., Appellant.

No. SC 84146.

Supreme Court of Missouri,
En Banc.

Nov. 12, 2002.

**434**

Mark E. Harris, Jack W. Green, Jr., Kansas City, for Appellant.

James E. Spain, Poplar Bluff, Hardy C. Menees, Clayton, for Respondent.

## I.

WILLIAM RAY PRICE, JR., Judge

Green Supply, Inc., a wholesaler of hunting supplies, appeals a contribution judgment in the amount of $625,000 rendered against it in favor of Gramex Corporation. Gramex is a retailer who purchased a defective tree seat from Green Supply and resold it to William Dunn, a consumer severely injured when the tree seat collapsed during use. Gramex paid a settlement in the amount of $1.25 million to Mr. and Mrs. Dunn in exchange for a complete release of itself and Green Supply. The judgment is affirmed.

## II.

### A. The Initial Settlement

On October 12, 1996, William Dunn fell eighteen feet from a tree platform, upon which he had been using a tree seat for deer hunting, and was paralyzed from the waist down. The tree platform was a deer stand Mr. Dunn constructed himself earlier that spring and was approximately two and one-half feet wide and between two to three feet in depth. The stand was nearly eighteen feet off the ground, attached to the tree. Mr. Dunn accessed the tree platform by a metal ladder affixed to the tree. Mr. Dunn fell from this platform when the stitching of the strap that secures the tree seat to the tree tore loose, and the seat collapsed.

Mr. Dunn had purchased the tree seat approximately ten days earlier from a Gramex retail store, which had, in turn, purchased the tree seat from Green Supply. The tree seat was manufactured by Big Game Products Company, Inc., S.I.R. Webbing, Inc., and Jackster, Inc. Big Game produced the seat, S.I.R. Webbing provided Big Game with nylon straps used in the manufacture of the tree seat, and Jackster sewed the nylon straps provided to Big Game by S.I.R. Webbing. The stitching of these nylon straps failed and caused Mr. Dunn to fall from the deer stand. Mr. Dunn and his wife, Tomi Lyn Dunn, sued Big Game, S.I.R. Webbing, Jackster, Green Supply and Gramex on theories of negligence and strict liability.

John Cook, attorney for Mr. Dunn and Mrs. Dunn ("the Dunns"), testified at trial as to the underlying product liability action brought by the Dunns against Gramex, Green Supply, Big Game, S.I.R. Webbing, and Jackster, and the resulting settlements between the parties. In the original action, Mr. Cook determined that he "would never have asked a jury ... for less than six million dollars. And depending on what happened at trial, it could easily have ranged up to ten million dollars." Mr. Cook testified as to the effect of the doctrine of joint and several liability on such a verdict:

> Joint and several liability means that, under the law, each defendant is jointly liable for the whole verdict. That is, even though they have various degrees of responsibility which a jury would have decided, any one defendant might have to pay it all and then be responsible for going to get the shares of the other defendants.

> \* \* \*

> Gramex may have had to have paid much more than [$1.25 million] had it not settled the case[.]

The parties stipulated to the amount of insurance coverage each manufacturer, and Gramex, carried. Big Game had $1 million in insurance coverage, S.I.R. Webbing had $2 million insurance coverage, Jackster had $1 million insurance coverage, and Gramex had $11 million insurance coverage—each stipulated amount was applicable to the claim by Mr. and Mrs.

Dunn. No evidence was presented as to the manufacturers' assets above their insurance coverage that might have been available to satisfy a judgment in excess of $4 million.

Less than three weeks before the trial date, the parties (excepting Jackster) participated in court ordered mediation. Mr. Cook testified at trial as to the details of the mediation. During mediation, Mr. Cook was adamant that the parties "were going to reach an agreement that date or they were going to go to trial to conclusion." Mr. Cook grouped the defendants into two groups for purposes of the mediation: "the manufacturing Defendants— Jackster, S.I.R. [Webbing] and Big Game—on the one hand and the seller Defendants—Green Supply and Gramex— on the other hand." Mr. Cook offered to settle with both Gramex and Green Supply for $1.25 million, but Green Supply refused the offer. Gramex agreed to settle the Dunns' claims against both Gramex and Green Supply for the $1.25 million offered, but, in exchange, required the Dunns "to dismiss not only Gramex but . . . to dismiss [the Dunns'] claims with prejudice against Green Supply as well." As Mr. Cook testified at trial, "[The Dunns] had to dismiss against Green Supply in order to allow Gramex to bring a contribution action against Green Supply." The Dunns agreed to Gramex's request, and executed a release. The release stated that "the sum of $1,250,000 is being paid to discharge and extinguish the liability of both Defendants, Gramex Corporation and Green Supply, Inc." The Dunns filed a memorandum with the trial court to dismiss with prejudice all claims against Green Supply, and Gramex paid the entire $1.25 million. Mr. Cook testified that in settling "[Gramex] got a bargain. It was reasonable."

Mr. Cook testified that after Gramex agreed to settle, but still during the course of the meeting, Big Game and S.I.R. Webbing also settled with the Dunns; Big Game agreed to pay the Dunns $900,000, and S.I.R. Webbing agreed to pay $1 million. Jackster settled with the Dunns six days later for $900,000. The Dunns' recovery from these settlements totaled $4,050,000.

## B. The Contribution Action: Pleadings and Evidence

After settling with the Dunns, Gramex filed a cross-claim against Green Supply in the original lawsuit filed by Mr. Dunn and Mrs. Dunn. In its cross-claim, Gramex alleged:

> Because the Defendant Green Supply, Inc. sold a defective product to Gramex Corporation, and thereby subjected Gramex Corporation to the [sic] liability to Plaintiffs, Gramex Corporation is entitled to be indemnified for all losses suffered by Gramex Corporation as a result of purchasing the defective product from the Defendant Green Supply, Inc.

To establish the liability of both Gramex and Green Supply to the Dunns, Gramex pleaded "that the tree seat was defective and unreasonably dangerous when put to an intended use." Gramex stated that the tree seat was "sold by Big Game Products Company, Inc. to the Defendant Green Supply, Inc., and that the Defendant Green Supply, Inc. sold the defective tree seat to Gramex Corporation, who in turn sold the defective tree seat to the Plaintiffs William Kent Dunn and Tomi Lyn Dunn." Gramex further alleged:

> As a direct and proximate result of the manufacture and sale of the defective tree seat, the Plaintiff William Kent Dunn has suffered painful and permanent personal injuries as alleged in this lawsuit. Because the Defendant Gra-

mex Corporation sold a defective and unreasonably dangerous product, it is liable to William Kent Dunn for the injuries suffered by William Kent Dunn. Almost nine months later, Gramex amended its cross-claim by interlineation to include a claim for contribution, as well as indemnity, against Green Supply.

In response to the cross-claim, Green Supply claimed as an affirmative defense that in settling with the Dunns, Gramex acted as a volunteer under section 537.762, RSMo (2000), and thus has no right to indemnity or contribution from Green Supply, an innocent seller. Green Supply also claimed that as a seller it was not liable to the Dunns in the original action, and therefore has no liability to Gramex for contribution or indemnity. Green Supply filed a motion to dismiss the cross-claim pursuant to section 537.762, however, Green Supply never called up the motion for hearing. The case proceeded to trial.

At trial, Mr. Dunn testified that he purchased the tree seat from a Gramex retail store in early October 1996. Gramex's buyer of sporting goods, Ronald Perry, inspected a copy of the receipt issued to Mr. Dunn at the time of purchase and testified as to the same. Mr. Perry also stated that Green Supply was Gramex's "distributor/wholesaler for the fall hunting season 1996." While reviewing invoices bearing the Green Supply heading, Mr. Perry testified that as Gramex's distributor, Green Supply sold Gramex at least four Big Game tree seats prior to the purchase date printed on Mr. Dunn's receipt for the tree seat. Mr. Perry stated that these four tree seats were all delivered to the Gramex retail store from which Mr. Dunn bought his tree seat.

Mr. Dunn testified at trial as to his use of the tree seat. On the bottom of the tree seat was written the following warning: "Caution. The tree seat is to be used at a height that allows the feet to be on the ground when in use as a seat only." Although Mr. Dunn did not read the warning before using the tree seat, Mr. Dunn testified at trial that he understood this warning to mean that the tree seat could be safely used if his feet were on the floor of the platform. Mr. Dunn used the tree seat in conjunction with the tree platform he constructed, and sat in the tree seat only with his feet planted "firmly on the platform." Just before the seat collapsed, Mr. Dunn attempted to "ease down on the seat." Mr. Dunn testified that he "ease[d] down" on the seat because he did not want the tree seat to make "any creaking noise" that would scare the deer away. As Mr. Dunn attempted to sit, the tree seat "gave way all at once" and dropped him eighteen feet to the ground.

Duane Meeker was Gramex's expert witness. His deposition was read into evidence at trial. Mr. Meeker testified that he understood that "[Mr.] Dunn was injured and the injury was a result of the defect" in the stitching of the strap of the tree seat. Mr. Meeker testified:

Well, the failure was a result of breaking of the stitching or the webbing used to secure the seat to the tree.

* * *

[T]he reason for [the tree seat] failing was [that] there was not sufficient stitching to take the loads that were created on the seat.

* * *

The fact that [the tree seat] did leave the manufacturer's hands in a form in which it was not sufficiently designed to handle the loads normally applied to the tree seat is a design defect or ... a manufacturing defect....

Mr. Meeker stated unequivocally that the tree seat "was a defective product." He also testified that "the stitching at the time of the accident was the same as it went through the distribution system and would have been in the same form as when it left [Gramex's] hands". The defect, Mr. Meeker testified, existed "when it left the manufacturer".

After the submission of all the evidence, the court instructed the jury that they were required to assess some percentage of fault against Green Supply if the jury believed:

First, [Green Supply] sold the tree seat in the course of its business to [Gramex], and

Second, [Gramex] thereafter sold the tree seat in the course of its business to William Kent Dunn, and

Third, the tree seat was in a defective condition, unreasonably dangerous when put to a reasonably anticipated use at the time of both sales, and

Fourth, the tree seat was used in a manner reasonably anticipated, and

Fifth, William Kent Dunn and Tomi Lyn Dunn were damaged as a direct result of such defective condition as existed when the tree seat was sold, and

Sixth, [Gramex's] settlement of the claims of William Kent Dunn and Tomi Lyn Dunn was reasonable.

Green Supply objected to this particular jury instruction "for the reason that there's no evidence to support that instruction." This objection was based on the "failure on the part of the Plaintiff [Gramex] to plead or prove fault, or negligence rather, on the part of either Gramex or Green [Supply] ... the type of fault of either party ... that would support this instruction." The court overruled Green Supply's objection, and tendered the instruction as quoted to the jury. Green Supply did not tender any instruction

seeking a jury determination on whether the Dunns could have obtained total recovery from the manufacturing defendants or seeking a determination of negligence on the part of Mr. Dunn or Gramex.

The jury returned a verdict which apportioned fault equally between Green Supply and Gramex, and the court entered judgment in favor of Gramex for $625,000, half of the $1.25 million settlement amount agreed to by Gramex and the Dunns. Green Supply filed a motion to set aside the verdict and judgment, alleging, *inter alia*, that Gramex had neither pleaded nor proved the elements of a claim for contribution. The court denied the motion, and Green Supply appeals.

## III.

It is helpful to briefly review Missouri law concerning products liability, comparative fault, negligence, joint and severable liability, and contribution to understand the relative rights of Gramex and Green Supply.

### A. Negligence and Strict Liability

A determination of liability in Missouri tort law initially hinged on negligence. Negligence is based upon the "reasonable anticipation that harm or injury is a likely result of acts or omissions." *Hull v. Gillioz*, 344 Mo. 1227, 130 S.W.2d 623, 628 (1939). Recovery in negligence depends upon whether a defendant violated a reasonable standard of care, and the resulting harm was foreseeable.

The Court in *Keener v. Dayton Electric Manufacturing Co.*, 445 S.W.2d 362, 364 (Mo.1969), adopted the rule of strict liability in defective product claims as defined in Restatement (Second) of Torts § 402A. *Lippard v. Houdaille Indus., Inc.*, 715 S.W.2d 491, 492 (Mo. banc 1986); *Blevins v. Cushman Motors*, 551

S.W.2d 602, 606 (Mo. banc 1977). The rule of strict liability in defective product actions causes a person who sells a product "in a defective condition [un]reasonably dangerous [1] to the user or consumer" to be liable to the ultimate user or consumer for any harm caused by use of the product if "(a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold." *Keener*, 445 S.W.2d at 364. Strict liability was adopted in part "to insure that the costs of injuries resulting from defective products are borne by the manufacturers (and sellers) that put such products on the market rather than by the injured persons who are powerless to protect themselves." *Id.* (citing *Greenman v. Yuba Power Prods., Inc.*, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, 901 (1963)). Negligence of the manufacturer or seller is not required in a strict liability case. *Welkener v. Kirkwood Drug Store Co.*, 734 S.W.2d 233, 241 (Mo.App.1987). Contributory negligence is not a defense to strict liability. *Keener*, 445 S.W.2d at 365.

### B. Contributory Negligence and Comparative Fault

Until 1983, a plaintiff's recovery in a negligence action was subject to the doctrine of contributory negligence. Under the doctrine of contributory negligence, a plaintiff could not recover damages if the plaintiff's own negligence, whether great or small, directly contributed to the injuries sustained. *See, e.g., Moore v. Kansas City & I.Rapid–Transit Ry.*, 126 Mo. 265, 29 S.W. 9, 12 (1894).

In the first cases of contributory negligence, the plaintiff's act of negligence occurred later in time than the defendant's act of negligence. *See Gustafson v. Ben-*

*da*, 661 S.W.2d 11, 13 (Mo. banc 1983) (citation omitted). In barring plaintiff's recovery in these early cases, the courts emphasized the relationship between the act and the injury rather than the negligent nature of the act. *See id.* (citation omitted). As the concept of negligence gained recognition, however, courts began to focus on the culpability of the parties. *See id.* With this shift in ideology came the doctrine of last clear chance, "an attempt to shift the loss to the party who was more to blame." *Id.* (citation omitted). The last clear chance doctrine, deemed "ethically and morally preferable to the prior rule that the slightest degree of negligence would bar the plaintiff's recovery," was, in reality, "nothing more or less than a comparison of fault." *Id.* (citation omitted).

The last clear chance doctrine did create a distinct problem, however; the rule shifted the entire loss to the defendant. In the water shed case of *Gustafson v. Benda*, this Court adopted the "obvious solution" of comparative negligence. 661 S.W.2d at 13 (citation omitted). Quoting Dean Prosser, "it is no better policy to relieve the negligent plaintiff of all responsibility for his injury than it is to relieve the negligent defendant." *Id.* "Joining all parties to a transaction in a single lawsuit" allows "for the comparison of the fault of all concerned". *Id.* at 15.

### C. Joint and Several Liability

 Joint and several liability is recognized in Missouri to allocate the financial burden of harm among the parties at fault in causing the plaintiff's injuries. *Smith v. Coffey*, 37 S.W.3d 797, 799 (Mo. banc 2001). "Joint or concurrent tort-feasors are severally, as well as jointly, answerable to the

---

**1.** Both the Restatement (Second) of Torts § 402A and decisions by this Court since

*Keener* use the language "unreasonably dangerous."

injured party for the full amount of the injuries. The injured party may sue all or any of the joint or concurrent tort-feasors and obtain a judgment against all or any of them." *Berry v. Kansas City Pub. Serv. Co.*, 343 Mo. 474, 121 S.W.2d 825, 833 (1938). "Unless the damage caused by each of such concurrent or joint tort-feasors is clearly separable . . . each is liable for the entire damage." *Id.* When an injured plaintiff enters into a settlement agreement "with one of the joint tort-feasors for a portion of the injuries, the injured person still retains her cause for action against the other tort-feasors and recovery may be had for the balance of the injury." *Id.* (citing *Clifton v. Caraker*, 50 S.W.2d 758 (Mo.App.1932)).

## D. Contribution

 The allocating function of comparative fault is also served by contribution among joint tortfeasors. *Teeter v. Mo. Highway & Transp. Comm'n,* 891 S.W.2d 817, 820 (Mo. banc 1995). In the leading case *Missouri Pacific Railroad Co. v. Whitehead & Kales Co.,* this Court adopted a contribution system which imposes liability on each tortfeasor proportionate to its negligence. 566 S.W.2d 466, 472 (Mo. banc 1978). The rationale for a contribution system in allocating liability among negligent tortfeasors is that, since each party has been negligent and each party's negligence has harmed plaintiff, the "foundation . . . principle of fairness" requires that each defendant should share liability to the extent of his responsibility. *Id.* at 472. Because the same policy considerations exist in both product liability claims and negligence claims, this Court has found "no distinction between products liability claims and negligence claims insofar as the right to contribution . . . is concerned." *Lowe v. Norfolk & W. Ry. Co.,* 753 S.W.2d 891, 895 (Mo. banc 1988).

"The principle of fairness" underlies both the right to contribution and the doctrine of comparative fault. *Teeter,* 891 S.W.2d at 820 (citing *Whitehead & Kales,* 566 S.W.2d at 472). Both these theories are applied "to ensure that the defendant is not forced to bear an unfair burden." *Id.* This is especially important because Missouri recognizes joint and several liability among joint tortfeasors.

## E. Statutory Law

The Missouri legislature has enacted a number of statutes concerning contribution, joint and several liability, and products liability. Some of these statutes are consistent with the development of the common law, others evidence significant decisions of public policy by the legislature.

Section 537.060, RSMo (2000), provides that defendants in a judgment for a private wrong are subject to contribution, but that

> [w]hen an agreement by release, covenant not to sue or not to enforce a judgment is given in good faith to one of two or more persons . . . such agreement shall not discharge any of the other tort-feasors for the damage unless the terms of the agreement so provide; however such agreement shall reduce the claim by the stipulated amount of the agreement, or in the amount of consideration paid, whichever is greater. The agreement shall discharge the tortfeasor to whom it is given from all liability for contribution or noncontractual indemnity. . . .

Section 537.067, RSMo (2000), provides in "all tort actions for damages, in which fault is not assessed to the plaintiff, the defendants shall be jointly and severally liable for the amount of the judgement rendered against such defendants."

Section 537.762, RSMo (2000), provides that "[a] defendant whose liability is based solely on his status as a seller in the stream of commerce may be dismissed from a products liability claim" so long as the defendant shows (1) that "another defendant, including the manufacturer, is properly before the court," and (2) that "total recovery may be had for plaintiff's claim" from the other defendants. Section 537.762.1, 2. A defendant may move for dismissal "within the time for filing an answer or other responsive pleading". Section 537.762.3. The statute allows the parties sixty days to conduct discovery on the issues raised in the motion and accompanying affidavit. Any party may move for a hearing on the motion to dismiss under section 537.762.5. Any dismissal pursuant to section 537.762 is interlocutory and may be set aside for good cause until final judgment is rendered in the case. Section 537.762.7.

Finally, section 537.765.1, RSMo (2000), provides that "[c]ontributory fault, as a complete bar to plaintiff's recovery in a products liability claim, is abolished. The doctrine of pure comparative fault shall apply to products liability claims as provided in this section." Section 537.765.2 provides "[d]efendant may plead and prove the fault of the plaintiff as an affirmative defense. Any fault chargeable to the plaintiff shall diminish proportionately the amount awarded as compensatory damages but shall not bar recovery."

## IV. Analysis

### A. Green Supply's Point I

■■■ Green Supply's first point on appeal states:

The trial court erred in failing to grant Green Supply's Motions for Directed Verdict and Motion to Set Aside the Verdict and Judgement (JNOV) regarding Gramex's contribution claim because Gramex failed to allege in its amended cross-claim any facts concerning the relative fault or negligence of Green Supply and ... Gramex's own relative fault or negligence as a joint tortfeasor, and therefore failed to sufficiently plead allegations of fact in support of each essential element of a claim for contribution.

■■■ This claim fails for two reasons. First, in examining claims brought after trial, the appellate court primarily looks to evidence properly before the trial court. *McDonald v. Thompson*, 35 S.W.3d 906, 909 (Mo.App.2001). When a party presents evidence at trial on issues not raised by the pleadings, and the opponent fails to object to the introduction of such evidence as beyond the scope of the pleadings, the issues "shall be treated in all respects as if they had been raised in the pleadings." Rule 55.33(b). *See also Lester v. Sayles*, 850 S.W.2d 858, 868–69 (Mo. banc 1993); *Patton v. May Dept. Stores Co.*, 762 S.W.2d 38, 42 (Mo. banc 1988). The pleadings are deemed amended to include the issue, so long as the evidence that gives rise to the amendment of pleadings "bears solely on the proposed new issue and is not relevant to some other issue already in the case." *Lester*, 850 S.W.2d at 869 (citation omitted). As will be discussed later, Gramex did introduce evidence at trial concerning the fault of both Gramex and Green Supply.

Second, Green Supply's argument that Gramex failed to allege facts in the cross-claim concerning either party's relative fault is simply wrong. Missouri Approved Instruction 25.04 sets out the required elements for a products liability claim. It states:

First, defendant sold the [product] in the course of defendant's business, and

Second, the [product] was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and

Third, the [product] was used in a manner reasonably anticipated, and

Fourth, plaintiff was damaged as a direct result of such defective condition as existed when the [product] was sold.[2]

MAI 6th 25.04.

In *Gramex's* cross-claim, Gramex pleaded "that the tree seat was defective and unreasonably dangerous when put to an intended use." Gramex also alleged that the tree seat that injured Mr. Dunn was "sold ... to the Defendant Green Supply, Inc., and that the Defendant Green Supply, Inc. sold the defective tree seat to Gramex Corporation, who in turn sold the defective tree seat to the Plaintiffs William Kent Dunn and Tomi Lyn Dunn." Gramex further alleged:

> As a direct and proximate result of the manufacture and sale of the defective tree seat, the Plaintiff William Kent Dunn has suffered painful and permanent personal injuries as alleged in this lawsuit. Because the Defendant Gramex Corporation sold a defective and unreasonably dangerous product, it is liable to William Kent Dunn for the injuries suffered by William Kent Dunn.

Gramex clearly alleged facts in the cross-claim concerning the fault of both Gramex and Green Supply that would subject each of them to a cause of action in strict liability for sale of the tree seat in question.

Point I is denied.

## B. Green Supply's Point II

■ Green Supply's second point on appeal states:

> The trial court erred in failing to grant Green Supply's Motions for Directed Verdict and Motion to Set Aside the Verdict and Judgment (JNOV) regarding Gramex's contribution claim because Gramex failed to present substantial evidence to the jury concerning any relative fault or negligence of Green Supply or any of Gramex's own relative fault or negligence as a joint tortfeasor and therefore failed to prove facts which are essential to Gramex's recovery and on which a jury could assess percentages of relative fault between Green Supply and Gramex.

■ Gramex submitted to the jury a cross-claim against Green Supply for contribution. "When two or more persons become liable in tort to the same person for the same harm, there is a right of contribution among them". *Safeway Stores, Inc. v. Raytown*, 633 S.W.2d 727, 730 (Mo. banc 1982) (quoting Restatement (Second) of Torts § 896A(1) (1965)). To maintain an action for contribution, both the party seeking contribution and the "defendant against whom contribution is sought must be ... tortfeasor[s], originally liable to the plaintiff-injured party." *Id.* (citing W. Prosser, Law of Torts, § 50, at 309 (4th ed.1971)). In this case, liability to the original plaintiff is based on products liability law. *See* MAI 25.04, *supra.* The basis of a strict liability action is the defective product.[3] The selling of this defective product is what subjects the manufacturer

---

**2.** Green Supply also refers to negligence in its point relied on. Negligence is not an element in a strict liability product defect claim. The claim for contribution was based on products liability, not negligence.

**3.** "The basis for the cause of action [in strict liability] is said to be the existence of a defect in, or a condition unreasonably dangerous for the intended use of, the product." 72 C.J.S. Supp. *Products Liability* § 7 (1975).

or retailer to liability.[4] *See, e.g., Keener,* 445 S.W.2d at 364 (quoting Restatement (Second) of Torts § 402A (1965)).

■ If the party seeking contribution entered into settlement with the original plaintiff, the party must hurdle additional obstacles before being entitled to contribution. Contribution is available to the settling party "only (1) if the liability of the person against whom contribution is sought has been extinguished; and (2) to the extent that the amount paid in settlement was reasonable." *St. Joseph's Hosp. v. Schierman,* 829 S.W.2d 4, 6 (Mo.App. 1991) (quoting section 4(b) of the Uniform Comparative Fault Act); *Greenstreet v. Rupert,* 795 S.W.2d 539, 541 (Mo.App.1990) (quoting section 4(b) of the Uniform Comparative Fault Act). Of course, even if a party makes the requisite showing, its right to contribution is limited to the "proportion of the total sum paid by it to [the injured party] as corresponds to the degree of fault of the third party defendant." *Whitehead & Kales,* 566 S.W.2d at 472.

At the close of trial, the trial court instructed the jury to assess some percentage of fault against Green Supply if the jury found:

> First, [Green Supply] sold the tree seat in the course of its business to [Gramex], and

> Second, [Gramex] thereafter sold the tree seat in the course of its business to William Kent Dunn, and

> Third, the tree seat was in a defective condition, unreasonably dangerous when put to a reasonably anticipated use at the time of both sales, and

> Fourth, the tree seat was used in a manner reasonably anticipated, and

> Fifth, William Kent Dunn and Tomi Lyn Dunn were damaged as a direct result of such defective condition as existed when the tree seat was sold, and

> Sixth, [Gramex's] settlement of the claims of William Kent Dunn and Tomi Lyn Dunn was reasonable.

Green Supply did not object to the substance of the instruction or to the specific language used in the instruction. Green Supply failed to preserve appellate review of these matters. Rule 70.03; *Blackstock v. Kohn,* 994 S.W.2d 947, 953 (Mo. banc 1999).

■ Green Supply objected to the instruction because of the "failure on the part of the Plaintiff [Gramex] to plead or prove fault, or negligence rather, on the part of either Gramex or Green [Supply] … the type of fault of either party … that would support this instruction." No other failure of proof was asserted. An examination of the evidence reveals that Gramex presented sufficient evidence at trial to support a finding of fault of both Gramex and Green Supply.

First, Gramex presented evidence that Green Supply sold the tree seat in the course of its business to Gramex and that Gramex sold the tree seat to Mr. Dunn. Second, Gramex presented evidence to establish that the tree seat was in defective condition, unreasonably dangerous when put to a reasonably anticipated use at the time of both sales. Gramex's expert, Duane Meeker, testified by deposition that:

---

4. "One who *sells* any product in a defective condition reasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if" specific requirements are met. *Keener,* 445 S.W.2d at 364 (quoting Restatement (Second) of Torts § 402A (1965)) (emphasis added).

Well, the failure was a result of breaking of the stitching on the webbing used to secure the seat to the tree.

\* \* \*

[T]he reason for [the tree seat] failing was [that] there was not sufficient stitching to take the loads that were created on the seat.

\* \* \*

The fact that [the tree seat] did leave the manufacturer's hands in a form in which it was not sufficiently designed to handle the loads normally applied to the tree seat is a design defect or ... a manufacturing defect....

Mr. Meeker further stated that the tree seat was in this defective condition at the time it was sold by Green Supply to Gramex and by Gramex to Mr. Dunn: "[T]he stitching at the time of the accident was the same as it went through the distribution system and would have been in the same form as when it left [Gramex's] hands". Green Supply did not refute this evidence.

Gramex also presented evidence that the tree seat was used in a manner reasonably anticipated. The bottom of the tree seat bore the following warning: "Caution. The tree seat is to be used at a height that allows the feet to be on the ground when in use as a seat only." Mr. Dunn testified that he understood this warning to mean that he could safely use the tree seat if his feet were on the floor of the tree platform. Mr. Dunn testified that while using the tree seat, his feet were planted "firmly on the platform" he constructed. Mr. Dunn also stated that when he attempted to sit down in the tree seat, he "ease[d] down on the seat" so that he would not make "any creaking noise" and scare away the deer.

Additionally, Gramex presented evidence to establish that Mr. Dunn was injured as a direct result of the defective condition of the tree seat as existed when the tree seat was sold by Green Supply to Gramex and by Gramex to Mr. Dunn.[5] Mr. Meeker stated that he understood that "[Mr.] Dunn was injured and the injury was a result of the defect" in the stitching of the strap of the tree seat. Mr. Meeker testified that the defect existed "when it left the manufacturer." Because the stitching was defective at the time the tree seat left the manufacturer Big Game, it was also defective later in time when Green Supply sold the seat to Gramex and Gramex sold the seat to Mr. Dunn. Green Supply did not present evidence that would lead to a contrary conclusion.

Finally, Gramex presented sufficient evidence to the jury to allow it to find that the settlement was reasonable. As the retail seller of the defective tree seat, Gramex might have been found jointly and severally liable to Mr. Dunn for between $6 and $10 million. The record only indicates insurance coverage of the upstream manufacturers of $4 million. This would have left Gramex, and Green Supply, subject to additional potential liability of $2 to $6 million. In addition, the Dunns might have chosen to execute solely against Gramex and left it with the risk and cost associated with recovering contribution from each of the other defendants, no easy task as evidenced by this very proceeding.

Point II is denied.

### C. Green Supply's Point III

Green Supply's third point on appeal states:

The trial court erred in failing to grant Green Supply's Motions for a Directed

5. See discussion at C., *infra.*

Verdict and Motion to Set Aside the Verdict and Judgement (JNOV) regarding Gramex's contribution claim because Gramex's settlement with plaintiff on behalf of itself and Green Supply was voluntary and unreasonable in that Gramex was an "innocent seller" pursuant to R.S. Mo. § 537.762 (1987) and was not liable to plaintiff for any amount, and the manufacturers of the product were joined in the case and had funds to provide for the settlement amounts sought by plaintiff.

Section 537.762 provides a downstream seller, that is a "defendant whose liability is based solely on his status as a seller in the stream of commerce", significant rights in Missouri product liability actions. It grants the right to an interlocutory order of dismissal so long as the downstream seller can prove that "another defendant, including the manufacturer", is in the lawsuit from whom plaintiff can obtain "total recovery". Subsection 4 of the statute allows sixty days for discovery regarding this issue and subsection 5 allows any party to call up the motion for ruling.

Although at first glance this statute appears to be merely a procedural device to save wholesalers and retailers from the significant costs of product liability litigation, *Pender v. Bell Asbestos Mines, Ltd.*, 46 F.Supp.2d 937, 940 (E.D.Mo.1999); *Carney v. BIC Corp.*, 88 F.3d 629 (8th Cir.1996), inherent in the statute is a substantive public policy choice of significant importance. To the extent that a plaintiff can otherwise obtain "total recovery", **all** liability of a downstream seller, who would otherwise be jointly and severally liable to plaintiff for damages and subject to contribution from the other defendants, is shift-

ed to upstream defendants, including the manufacturer.[6]

It is interesting that Green Supply does not raise as a point on appeal that its own motion to dismiss was not granted. This must be because it neither called up its own motion for hearing prior to trial nor submitted any instructions or verdict form for a jury determination of the factual elements required, although either procedural method was available to it. Any issue as to Green Supply's own rights as a "downstream seller" under section 537.762 was waived.

■ In like manner, Green Supply waived any affirmative defense that would bar Gramex from seeking contribution or indemnity because Gramex failed to bring up its own section 537.762 motion to dismiss prior to settlement. Section 537.762 allows "[a]ny party" to call up such motions for hearing, not just the moving party. Green Supply failed to call up Gramex's motion or to submit this issue to the jury and has preserved nothing for review under the statute.

■ Nonetheless, the record below would not have supported such an affirmative defense by Green Supply against Gramex. The Dunns' attorney, John Cook, an experienced trial lawyer, testified that he intended to ask the jury for between $6 and $10 million. Considering the grave injuries suffered by Mr. Dunn, there was a substantial likelihood that a verdict might have been recovered in that range. For the purpose of determining if a defendant is entitled to dismissal pursuant to section 537.762.2, the amount that the trial court finds that plaintiff requests **and** might reasonably obtain from the jury is the amount

---

**6.** Although not a manufacturer, Green Supply was the upstream seller to Gramex. Because Gramex has not argued that it is entitled to

complete indemnity under the statute from Green Supply, we do not address the issue.

to be considered as "total recovery ... for plaintiff's claim."

The record below, however, does not establish that the defendants upstream from Green Supply could have satisfied a verdict in that amount. The parties stipulated to each manufacturing defendant's insurance coverage, which aggregated to $4 million. There was no evidence of other assets available from these upstream defendants to satisfy a judgment for any greater amount.

Green Supply simply did not prove that it was entitled to dismissal pursuant to section 537.762 or that Gramex was entitled to dismissal absent the contribution of assets from Green Supply. Because Green Supply is an "upstream seller" to Gramex, it is not entitled to rely upon any assets that Gramex might have available to contribute.

Shortly before trial the Dunns' attorney demanded settlement from Gramex and Green Supply for $1.25 million. He negotiated with Gramex and Green Supply as a "group". At that time it was not known whether any of the other defendants would reach a settlement with the Dunns. While Green Supply was free to reject any contribution to this settlement demand, Gramex was equally free to buy peace from plaintiff, on both their behalves, and take its chances against Green Supply, for contribution or indemnity. The jury below was persuaded that the settlement made by Gramex was reasonable and assessed fifty percent responsibility to Green Supply and there is sufficient evidence in the record to support this finding.

Finally, no instruction was requested to present to the jury the question of whether Gramex or Green Supply was liable for any reason other than its "status as a seller in the stream of commerce". Nor was an instruction requested to direct the jury how to allocate liability between "innocent" sellers. We do not address whether any other allocation might have been allowed or required by section 537.762 because neither of the parties raised this issue.[7]

It is clear that our legislature sought to protect "innocent" wholesalers and retailers from the perils of products liability claims, both procedurally and substantively by section 537.762. There is no indication in the statute, however, that the legislature intended to inhibit the freedom of any party to reach a voluntary settlement and, thereafter, to seek contribution or indemnity as appropriate.

Point III is denied.

## V.

The judgment of the trial court is affirmed.

All concur.

---

**7.** Although section 537.762 clearly shifts liability from "innocent" sellers upstream to manufacturers, it does not expressly state how liability should be allocated among "innocent" sellers, whether wholesalers, retailers, etc. It might be argued that all liability should be shifted from an "innocent" downstream seller to an "innocent" upstream seller. It might also be argued that allocation be per capita among all "innocent" sellers. It might even be argued that specific evidence might support allocation on some other basis.