

# SUPREME COURT OF MISSOURI
## en banc

CENTRAL TRUST AND INVESTMENT )
COMPANY, )
)
         Appellant, )
)
    v. )        No. SC93182
)
SIGNALPOINT ASSET MANAGEMENT, )
LLC, )
)
        Respondent. )

### APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY
The Honorable Michael Cordonnier, Judge

### *Opinion issued February 25, 2014*

This appeal concerns, primarily, whether a company can be liable for misappropriation of trade secrets, pursuant to the Missouri Uniform Trade Secrets Act, §§ 417.450 to 417.467, RSMo 2000[1] (MUTSA), for affiliating with an ex-employee of another company. Central Trust and Investment Co. ("Central Trust"), which is the plaintiff, had purchased another company prior to this suit. Central Trust sued SignalPoint Asset Management, LLC ("SignalPoint") for affiliating with the predecessor company's ex-employee, who acquired the predecessor's client list. Central Trust appeals the circuit court's entry of summary judgment in favor of SignalPoint. This Court holds that Central Trust has not demonstrated that a genuine issue of material fact exists as to whether

---

[1] All statutory references are to RSMo 2000 unless otherwise indicated.

SignalPoint "misappropriated" the client list of Central Trust as that term is defined by the MUTSA. This failure also justified the circuit court's grant of summary judgment against Central Trust's claim of tortious interference with business relations. Furthermore, Central Trust's civil conspiracy claim is moot because the other remaining defendants have been dismissed from the case, and the circuit court did not abuse its discretion in overruling Central Trust's motion for reconsideration of summary judgment and for a new trial alleging newly discovered evidence. The circuit court's judgment is affirmed.

## Factual Background

In 2009, Central Trust purchased Springfield Trust & Investment Company (STC), which was a company that provided financial management services. Troy Kennedy worked for STC as a director and executive officer before the business's sale. His primary job responsibilities were to develop new business and act as a relationship manager to existing clients. Although Kennedy signed an employment agreement to work for STC through 2013, which contained a covenant not to compete, the agreement stated that the covenant not to compete did not apply if the company was sold.[2]

Kennedy left STC's employment on November 20, 2009, the day Central Trust purchased STC via a stock purchase agreement. The next day, Kennedy founded a new company, ITI Financial Management, LLC (ITI), which provides financial advice and investment management services in competition with Central Trust. Kennedy then began

---

[2] That provision stated the following: "[T]his Agreement and the covenant not to compete shall become void and unenforceable in the event of a sale of [STC] or a sale of a controlling interest in [STC]. This covenant not to compete shall not be applicable if a substantial interest in [STC] is sold (more than 50% of the stock) to individuals or other entities who are not shareholders as of 1/1/2007."

soliciting Central Trust's clients. As of May 2010, 85 of ITI's 90 clients were former clients of STC or Central Trust.

Kennedy knew about the merger negotiations while he was still an employee of STC, and he prepared for his potential departure. He told clients he planned to leave the company if the sale of STC was consummated, and he solicited other STC employees to leave with him. Kennedy placed a list of the clients, for whom he provided services while at STC, in a safe deposit box. This list was attached as an exhibit to his employment contract. Kennedy also placed in a safe deposit box, upon advice of counsel, a cell phone containing the contact information of approximately 200 STC clients and 39 pages of documents containing information about STC's clients, including names, addresses, telephone numbers, email addresses, and confidential financial information.[3] Kennedy also admitted that he compiled a list of client names from memory after leaving STC.

Instead of registering himself or ITI with the Securities and Exchange Commission (SEC) as an "investment adviser," Kennedy began affiliating with SignalPoint, which is a registered investment adviser.[4] On February 22, 2010, Kennedy signed an agreement with SignalPoint naming him an "Independent Advisor Representative" of SignalPoint. The agreement allows Kennedy, through SignalPoint, to solicit and receive, from his clients,

---

[3] The existence of the safe deposit box containing a cell phone and this client list came to light during Kennedy's deposition on May 10, 2011. However, Central Trust did not have physical access to the documents and cell phone until later. Central Trust did not submit them to the circuit court until Central Trust investigated the safe deposit box, which happened after the circuit court entered summary judgment in favor of SignalPoint. Central Trust submitted the documents and cell phone under seal with its motion for reconsideration of summary judgment and for a new trial.

[4] "Investment advisers," which are companies or people who provide certain kinds of investment advice and financial services, must register with the SEC pursuant to 15 U.S.C. §§ 80a-2(a)(20); 80b-3 (West 2011). According to Kennedy's deposition testimony, it was cheaper for him to affiliate with a registered investment adviser than to register himself.

orders to buy and sell securities or to facilitate other types of securities transactions. Kennedy invests in mutual funds for clients and offers other investment services through SignalPoint. In addition, all of his emails go through SignalPoint, and he tells clients he is affiliated with SignalPoint. In exchange, SignalPoint receives a set fee per trade of securities and also 10 percent of the total amount of the fees Kennedy charges his clients. The agreement states that Kennedy is an independent contractor of SignalPoint, not an employee, and that Kennedy has no right to bind SignalPoint by his actions.[5]

Central Trust filed a petition against Kennedy and ITI, alleging a myriad of claims; it later filed a first amended petition adding SignalPoint as a defendant. The first amended petition alleges three claims against SignalPoint: (1) misappropriation of trade secrets, (2) tortious interference with business relations, and (3) civil conspiracy.

The first amended petition alleges that Kennedy, ITI, and SignalPoint had a business relationship, but it does not state that Kennedy or ITI acted as an agent of SignalPoint. For the misappropriation of trade secrets claim against SignalPoint, the first amended petition states that only SignalPoint "used and continues to misappropriate" Central Trust's trade secrets. For the second claim, tortious interference with business relations, the first amended petition states: that "SignalPoint has a business arrangement with ... Kennedy in which ... Kennedy has solicited and continues to solicit Central Trust's customers to transfer

_____

[5] The "Independent Advisor Representative Agreement" states the following: "It is mutually understood and agreed that you are an independent contractor of SIGNALPOINT and that you will not be treated as an employee for federal tax or any other purposes. ... You will have no right to bind SIGNALPOINT by any statement, promise, representation, agreement, or contract of any kind, or to waive any of SIGNALPOINT's rights or to obligate SIGNALPOINT in writing. It is stipulated that you are not an employee, officer, partner, or joint venture of SIGNALPOINT."

their accounts to ... SignalPoint;" that SignalPoint received trade secret information from Kennedy; that SignalPoint knew "Kennedy was misappropriating Central Trust's trade secrets to solicit Central Trust's clients;" and that SignalPoint "assist[ed] and work[ed] with ... Kennedy to induce ... Central Trust's clients" to transfer their accounts to SignalPoint. For the third claim, civil conspiracy, the first amended petition alleges that Kennedy, ITI, and SignalPoint "reached an agreement, understanding, and meeting of the minds whereby ... Kennedy and ... ITI ... agreed to solicit Central Trust's customers to transfer their accounts to ... SignalPoint." No statement appears in the first amended petition alleging that Kennedy or ITI was SignalPoint's agent or employee, and there is no allegation that SignalPoint had the right to control Kennedy or ITI.[6]

Kennedy and ITI filed a joint motion for summary judgment, and SignalPoint filed its own separate motion for summary judgment. The circuit court overruled the motion filed by Kennedy and ITI, but it sustained SignalPoint's motion and entered summary judgment in SignalPoint's favor. The circuit court's judgment states that there is no genuine issue of material fact and that SignalPoint is entitled to judgment as a matter of law as to all three of the claims asserted against it.[7] Central Trust gained access to the contents of the safe

---

[6] Central Trust's second amended petition, which contains substantially identical claims against SignalPoint, is irrelevant to this appeal because it was filed after the entry of summary judgment in favor of SignalPoint.

[7] The circuit court titled its judgment "Amended Summary Judgment," but the circuit court had not entered any previous judgment regarding SignalPoint's motion. The circuit court had entered a note into the Case.net docket entries stating that there was no genuine issue of material fact and that SignalPoint was entitled to judgment as a matter of law. The Case.net note requested counsel for SignalPoint "to prepare a formal judgment consistent with these findings and submit to the Court." The circuit court had also issued a written order stating that Central Trust's client list does not qualify as a trade secret. Neither of these statements by the circuit court, the note or the order, were appealable final judgments. Only the "Amended Summary Judgment" is an appealable final

5

deposit box after the circuit court entered its judgment, and it moved for reconsideration of SignalPoint's motion for summary judgment and for a new trial in light of the allegedly newly discovered documents and cell phone. The circuit court overruled Central Trust's motion.

Central Trust filed an appeal. While the appeal was pending in the court of appeals, Central Trust voluntarily dismissed its claims against Kennedy and ITI in the circuit court. This Court ordered transfer after the court of appeals issued an opinion and, therefore, has jurisdiction. *See* Mo. Const. art. V, § 10.

## Standard of Review

This Court set out the summary judgment standard in *Goerlitz v. City of Maryville*:

> The trial court makes its decision to grant summary judgment based on the pleadings, record submitted, and the law; therefore, this Court need not defer to the trial court's determination and reviews the grant of summary judgment *de novo*. *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993); Rule 74.04. In reviewing the decision to grant summary judgment, this Court applies the same criteria as the trial court in determining whether summary judgment was proper. *Id.* Summary judgment is only proper if the moving party establishes that there is no genuine issue as to the material facts and that the movant is entitled to judgment as a matter of law. *Id.* The facts contained in affidavits or otherwise in support of a party's motion are accepted "as true unless contradicted by the non-moving party's response to the summary judgment motion." *Id.* Only genuine disputes as to material facts preclude summary judgment. *Id.* at 378. A material fact in the context of summary judgment is one from which the right to judgment flows. *Id.*

---

judgment. *Compare* Rule 74.01(a) ("A judgment is entered when a writing signed by the judge and denominated 'judgment' or 'decree' is filed.") *with* Rule 74.02 ("Every direction of a court made or entered in writing and not included in a judgment is an order."). *See Buemi v. Kerckhoff*, 359 S.W.3d 16, 20 (Mo. banc 2011) (stating that the right to appeal is governed by § 512.020, which "requires that there be a 'final judgment' as a prerequisite to appellate review").

6

A defending party ... may establish a right to summary judgment by demonstrating: (1) facts negating any one of the elements of the non-movant's claim; (2) "that the non-movant, after an adequate period for discovery, has not been able and will not be able to produce sufficient evidence to allow the trier of fact to find the existence of any one" of the elements of the non-movant's claim; or (3) "that there is no genuine dispute as to the existence of the facts necessary to support movant's properly pleaded affirmative defense." *Id.* at 381. Each of these three methods individually "establishes the right to judgment as a matter of law." *Id.* ...

"The record below is reviewed in the light most favorable to the party against whom summary judgment was entered, and that party is entitled to the benefit of all reasonable inferences from the record. However, facts contained in affidavits or otherwise in support of the party's motion are accepted as true unless contradicted by the non-moving party's response to the summary judgment motion." *Hammack v. Coffelt Land Title, Inc.*, 284 S.W.3d 175, 177-78 (Mo. App. 2009) (internal quotations and citations omitted). *See also ITT Commercial Fin.*, 854 S.W.2d at 376. However, an appellate court reviewing the ruling of a circuit court is bound to consider the forms of the affidavits supporting and opposing summary judgment in accord with Rule 74.04(e), which requires the affidavits to be made on personal knowledge and set forth facts that would be admissible in evidence. Additionally, the affidavit "shall show affirmatively that the affiant is competent to testify to the matters stated therein." Rule 74.04(e).

333 S.W.3d 450, 452-53 (Mo. banc 2011). In addition, the non-movant must support denials with specific references to discovery, exhibits, or affidavits demonstrating a genuine factual issue for trial. Rule 74.04(c)(2), (c)(4). Facts not properly supported under Rule 74.04(c)(2) or (c)(4) are deemed admitted.

### Misappropriation of Trade Secrets

A claim for misappropriation of trade secrets under the MUTSA has three elements: (1) a trade secret exists, (2) the defendant misappropriated the trade secret, and (3) the plaintiff is entitled to either damages or injunctive relief. Sections 417.453; 417.455 (claims for injunctive relief); 417.457 (claims for damages). Central Trust has not demonstrated

7

that a genuine issue of material fact exists as to the misappropriation element because it failed to present any support for the allegation that SignalPoint had access to the client list.[8]

Resolution of this case does not require this Court to decide whether Central Trust's client list qualifies as a trade secret under the MUTSA because, even if it is a trade secret, there was no misappropriation of the client list by SignalPoint.[9] The MUTSA defines "misappropriation" in the following way:

---

[8] Central Trust has not clearly explained what it means by "client list" in arguing that it is a trade secret. A review of Central Trust's amended petition, its statement of additional material facts, other responsive pleadings, and even its appellate brief reveals no precise definition for the repeatedly used terms "Client Database," "Client Lists," and "customer list." The amended petition asserts that the "Client Database" "contains names, contact information, and personal and private information not available to the public of its clients and prospective clients," as well as information relating to "client and potential client lists, personal and private information about clients and potential clients; specialized needs and preferences of clients and potential clients; client and prospective client contacts; marketing information; and the size and profitability of their clients' accounts." In Central Trust's response to SignalPoint's statement of uncontroverted facts, Central Trust stated that Kennedy placed the client list that was attached to his employment contract in a safe deposit box. And Central Trust asserted in its response that "in August 2009, [Kennedy] took a cell phone containing the contacts and names of approximately 200 STC clients" and another "list of his clients and relationships at STC" and put them in a safe deposit box. Central Trust's response also took issue with the fact that Kennedy "logged into STC/Central Trust's computer system" the night he left STC. Last, Central Trust refers throughout the amended petition and responsive pleadings to "STC's customer list" with no further explanation as to what that encompasses. For purposes of clarity, this opinion refers to these variations collectively as the "client list."

[9] Central Trust argues that the client list is a trade secret. A "trade secret" is defined by the MUTSA as "information," including but not limited to a "compilation," that meets two qualifications: (a) it "[d]erives independent economic value ... from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use," and (b) it "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Section 417.453(4).

Central Trust argues that its client list is a trade secret because Central Trust derives "independent economic value" from the "compilation" of names on the list and because it spent substantial resources compiling and protecting its contents. It contends the client list is not merely useful to its competitors as a reference tool for the contact information of each individual client, but that it also has value because it is a compilation of people who are likely to have money on hand to invest and who are willing to use personal financial asset management services. Central Trust additionally contends that this list of clients is not "readily ascertainable" by its competitors merely by searching the Internet or looking through trade publications or a phonebook.

8

(a) **Acquisition of** a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) **Disclosure or use of** a trade secret of a person without express or implied consent by another person who:

a. Used improper means to acquire knowledge of the trade secret; or

b. Before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake; or

c. At the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:

i. Derived from or through a person who had utilized improper means to acquire it;

ii. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

iii. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; ...

Section 417.453(2) (emphasis added). By the plain language of the statute, then, a misappropriation occurs in only three scenarios: (1) when a person acquires the trade secret while knowing or having reason to know that he or she is doing so by improper means, (2) when a person who has acquired or derived knowledge of the trade secret discloses it

---

Courts in other jurisdictions have employed case specific factual analyses under their own statutes or common law to determine whether a client list is a trade secret. Some courts have found a client list to be a trade secret, and some have found that it is not. *E.g.*, *JPMorgan Chase Bank, N.A. v. Kohler*, No. 3:09CV-677-H, 2009 WL 2913897, at *1 (W.D. Ky. Sept. 8, 2009) (stating that the weight of authority is that client lists of financial firms are considered trade secrets); *Morgan Stanley DW, Inc. v. Rothe*, 150 F. Supp. 2d 67, 76 (D.D.C. 2001) (stating that client lists of financial firms are trade secrets under the District of Columbia Uniform Trade Secrets Act). *Compare Town & Country House & Home Serv., Inc. v. Newberry*, 170 N.Y.S.2d 328 (1958) (holding that the client list of an in-home cleaning company, which spent years soliciting potential clients to compile a list of those likely to use in-home cleaning services, was a protectable trade secret under New York common law), *with Corroon & Black-Rutters & Roberts, Inc. v. Hosch*, 325 N.W.2d 883, 886 (Wis. 1982) (holding that the client list of an insurance agency was not a trade secret under Wisconsin common law and stating that "customer lists are the periphery of the law of unfair competition" "because legal protection would not provide the incentive to compile such lists; most are developed in the normal course of business, anyway"), *superseded by statute as stated in Burbank Grease Servs., LLC v. Sokolowksi*, 717 N.W.2d 781, 791 & n.7 (Wis. 2006).

without the owner's consent, or (3) when a person who has acquired or derived knowledge of the trade secret uses it without the owner's consent. *Id.*

### *SignalPoint Itself Did Not Misappropriate the Client List.*

Although Central Trust supported the allegation that Kennedy acquired a client list, it provided no support in its response to SignalPoint's motion for summary judgment that SignalPoint ever obtained a copy of Central Trust's client list, or that it ever accessed any safe deposit box that contained Kennedy's cell phone or a list of Central Trust's clients. SignalPoint asserted, in its statement of uncontroverted material facts, that "Kennedy never provided SignalPoint with any client or customer list or other document from [STC] or Central Trust." SignalPoint supported this statement of fact by an affidavit of an officer of SignalPoint. Central Trust denied this statement of fact with a citation only to the affidavit of Kennedy. The cited portions of the affidavit state nothing about whether SignalPoint had ever been given a client list. Accordingly, it is deemed admitted that SignalPoint had not been provided the client list. *See* Rule 74.04(c)(2), (c)(4). [10]

Because Central Trust provided no support for the allegation that SignalPoint ever had access to the client list, it could not have acquired, disclosed, or used it. The MUTSA requires acquisition of a trade secret or "knowledge of the trade secret" for misappropriation. SignalPoint must at least have had some way of knowing what was on

---

[10] This Court's review of the summary judgment record in this matter reveals that the responsive pleadings filed by Central Trust fail to comply with the requirement of Rule 74.02(c)(2) that all denials be supported by appropriate citation to exhibits, affidavits, or other discovery documents. Some of Central Trust's denials cite to a document or exhibit that does not contain the fact or assertion that is supposed to be there. This not only hampers this Court's review but also results in the facts being deemed admitted. *See* Rule 74.04(c)(2), (c)(4).

the list to have used or disclosed it, regardless of whether SignalPoint knew that such a list existed and that Kennedy had access to it. There is no support for the allegation that SignalPoint ever saw the client list that Central Trust characterizes as a "trade secret."

Although SignalPoint performs services for and bills people who were once Central Trust or STC clients and who eventually became clients of Kennedy and SignalPoint, there is no support in the record that SignalPoint had any way of knowing which of Kennedy's clients are new clients and which are former clients of STC or Central Trust. Indeed, Central Trust admits in its brief to this Court that "[t]here is no evidence SignalPoint asked Kennedy which clients were transferred from Central Trust after being notified." SignalPoint can identify which of its clients are also Kennedy's clients, but this is not the compilation of names that Central Trust argues is a "trade secret." Because Central Trust has failed to demonstrate with citations to the record that SignalPoint ever had access to the client list, there is no genuine issue of material fact that SignalPoint misappropriated any "trade secret" of Central Trust.

### No Agency Liability

Central Trust also argues that SignalPoint is vicariously liable for Kennedy's misappropriation. However, Central Trust never pleaded the existence of a principal-agent or employer-employee relationship between Kennedy and SignalPoint.

Generally, the wrongful acts of an agent can be imputed to the principal where an agency relationship exists. *See Bach v. Winfield-Foley Fire Protection Dist.*, 257 S.W.3d 605, 608 (Mo. banc 2008). Agency is the fiduciary relationship resulting from the manifestation of consent by an agent to a principal that the agent will act on the principal's

11

behalf and subject to his or her control. *Id.* Likewise, where an employer-employee relationship exists, the doctrine of *respondeat superior* holds that the employer is vicariously liable for the injury-causing conduct of an employee done within the course and scope of the employment. *Cluck v. Union Pac. R.R. Co.*, 367 S.W.3d 25, 29 (Mo. banc 2012). An employer generally is not held vicariously liable, however, for the acts of its independent contractors, who are not considered employees for purposes of *respondeat superior*. *Kaplan v. U.S. Bank, N.A.*, 166 S.W.3d 60, 66 (Mo. App. 2003). For a principal-agent or employer-employee relationship to exist, the principal or employer must have the "right to control" the agent or employee. *Bach*, 257 S.W.3d at 608; *Kaplan*, 166 S.W.3d at 66.

Kennedy signed an "Independent Advisor Representative Agreement" with SignalPoint. The agreement states that Kennedy is an independent contractor, disclaims the existence of an employer-employee relationship, and states that Kennedy has no right to bind SignalPoint by his actions. Central Trust's first amended petition alleges only that Kennedy and SignalPoint had a "business arrangement" through which SignalPoint "assist[ed] and work[ed] with" Kennedy to induce Central Trust clients to transfer their accounts to SignalPoint.

There is no allegation in the first amended petition that Kennedy or ITI was SignalPoint's agent or employee or that SignalPoint had the right to control Kennedy or ITI. The first amended petition does not state a claim for SignalPoint's liability based on a principal-agent or employer-employee relationship. *See Bach*, 257 S.W.3d at 608; *Kaplan*, 166 S.W.3d at 66. Therefore, Kennedy's actions in acquiring the client list cannot be

imputed to SignalPoint. *See Smith v. City of St. Louis*, 395 S.W.3d 20, 24 (Mo. banc 2013) (stating that a court cannot enter a valid judgment on a claim not raised in the petition); *see also Allen Quarries, Inc. v. Auge*, 244 S.W.3d 781, 783 (Mo. App. 2008) ("It is axiomatic that a trial court cannot grant judgment on a cause of action not pleaded.").[11]

### Tortious Interference with Business Relations

Because there is no genuine issue of material fact as to Central Trust's claim of misappropriation of trade secrets, there is also no genuine issue of material fact as to Central Trust's second claim of tortious interference with business relations. To prove a claim for tortious interference with a contract or a business expectancy, the plaintiff must prove the following five elements: "(1) a contract or a valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) absence of justification; and (5) damages resulting from defendant's conduct." *Western Blue Print Co. v. Roberts*, 367 S.W.3d 7, 19 (Mo. banc 2012). The plaintiff cannot prove the fourth element, absence of justification, if the defendant has a legitimate economic interest in the business expectancy,

---

[11] Central Trust also argues that it need only show that SignalPoint "aided and abetted [Kennedy's] acts" to show misappropriation. (Appellant's Br. at 51.) In support of this proposition, Central Trust points to *Insituform Techs., Inc. v. Reynolds, Inc.*, 398 F. Supp. 2d 1058 (E.D. Mo. 2005). This case states that the standard for holding a corporate officer liable for the corporation's misappropriation is whether the officer aided and abetted the corporation. *Id.* at 1063-64 (citing *Grothe v. Helterbrand*, 946 S.W.2d 301, 305 (Mo. App. 1997) (discussing the aiding and abetting standard for corporate officers' misappropriation outside the context of the MUTSA)). There is no evidence that Kennedy is an officer of SignalPoint, and Central Trust's argument that the Court adopt an "aiding and abetting" standard for misappropriation more generally is misguided. The MUTSA expressly requires acquisition, disclosure, or use of a trade secret to show misappropriation. It contains no indication that "aiding and abetting" someone else's misappropriation is enough to trigger liability.

unless the plaintiff proves the defendant employed "improper means." *Id.* at 20. "Improper means" can be any independently wrongful act recognized by statute or the common law. *Id.*

Central Trust concedes in its appellate brief that SignalPoint has a legitimate economic interest in Central Trust's expectation of continuing to do business with its former clients because the two companies are direct competitors. *See Briner Elec. Co. v. Sachs Elec. Co.*, 680 S.W.2d 737, 743 (Mo. App. 1984) (holding that competition is a legitimate economic interest and valid justification for interference with a business expectancy, where there is no evidence of improper means). The only "improper means" alleged by Central Trust is that SignalPoint misappropriated a trade secret. *See Lyn-Flex W., Inc. v. Dieckhaus*, 24 S.W.3d 693, 700 (Mo. App. 1999) (holding that "use of a misappropriated trade secret obtained in violation of a fiduciary duty is not a valid justification."). Because there is no genuine issue of material fact as to Central Trust's misappropriation claim against SignalPoint, Central Trust cannot prove "improper means," which is an essential element of its claim of tortious interference with business relations. Therefore, summary judgment on the second claim is also appropriate. *Goerlitz*, 333 S.W.3d at 453; *ITT Commercial Fin. Corp.*, 854 S.W.2d at 381.

## Civil Conspiracy

Central Trust claims that SignalPoint, Kennedy, and ITI conspired to commit the torts of misappropriation of trade secrets and interference with business relations. The civil conspiracy claim is moot because Central Trust voluntarily dismissed its claims against Kennedy and ITI in the circuit court while this appeal was pending.

14

"Although civil conspiracy has its own elements that must be proven, it is not a separate and distinct action." *Western Blue Print Co., LLC*, 367 S.W.3d at 22. "'[R]ather, it acts to hold the conspirators jointly and severally liable for the underlying act.'" *Id.* The doctrine of joint and several liability allocates the financial burden of harm among multiple parties at fault for the plaintiff's injuries. *Gramex Corp. v. Green Supply, Inc.*, 89 S.W.3d 432, 439-40 (Mo. banc 2002). "Joint and several liability depends on the existence of two or more defendants." *Kibbons v. Union Elec. Co.*, 823 S.W.2d 485, 491 (Mo. banc 1992).

"[A] cause of action is moot when the question presented for decision seeks a judgment upon some matter which, if the judgment was rendered, would not have any practical effect upon any then existing controversy." *State ex rel. Reed v. Reardon*, 41 S.W.3d 470, 473 (Mo. banc 2001) (internal quotation marks and citations omitted). SignalPoint is the only remaining defendant in this case because Central Trust voluntarily dismissed its claims against Kennedy and ITI in the circuit court during the pendency of this appeal. Thus, there can be no joint and several liability. *See Kibbons*, 823 S.W.2d at 491. Since the only effect of a claim of civil conspiracy is to hold multiple defendants jointly and severally liable, Central Trust's claim of civil conspiracy is moot. *See Western Blue Print Co., LLC*, 367 S.W.3d at 22; *State ex rel. Reed*, 41 S.W.3d at 473.

### Motion for Reconsideration and for New Trial

Central Trust moved for reconsideration and for a new trial due to newly discovered evidence after the circuit court entered summary judgment in favor of SignalPoint. Central Trust argues that the circuit court should not have overruled this motion because Central

15

Trust did not discover the contents of the safe deposit box until after the circuit court entered judgment.

A party can move for a new trial following the entry of summary judgment; the motion is considered a motion for a new trial in a court-tried case. *Taylor v. United Parcel Serv., Inc.*, 854 S.W.2d 390, 393 (Mo. banc 1993); *see* Rules 73.01(d); 78.01. However, the Missouri Rules of Court do not recognize a motion for reconsideration. *St. Louis Cnty. v. Prestige Travel, Inc.*, 344 S.W.3d 708, 712 (Mo. banc 2011). This Court has treated a motion for reconsideration the same as a motion for a new trial for purposes of discerning the time limit to file a notice of appeal. *See Taylor*, 854 S.W.2d at 393.[12]

This Court reviews a circuit court's judgment overruling a new trial motion for abuse of discretion. *Badahman v. Catering St. Louis*, 395 S.W.3d 29, 39 (Mo. banc 2013). An abuse of discretion occurs when the circuit court's ruling "'is clearly against the logic of the circumstances then before it and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.'" *St. Louis Cnty. v. River Bend Estates Homeowners' Ass'n*, 408 S.W.3d 116, 134 (Mo. banc 2013). Motions for new trial based on newly discovered evidence "are looked upon with disfavor, and the party urging such an error on appeal must carry a heavy burden." *Soehlke v. Soehlke*, 398 S.W.3d 10, 21 n.6 (Mo. banc 2013). To obtain a new trial based on newly discovered evidence, the movant must show:

---

[12] Because Central Trust sought the same relief in its request for reconsideration as in its request for a new trial—which is a recognized form of relief under the rules—this Court need not decide whether the motion for reconsideration due to newly discovered evidence is reviewable on appeal.

> 1) the evidence has come to the knowledge of the party since the trial; 2) failure to discover the evidence sooner was not the result of a lack of due diligence; 3) the evidence is so material that a new trial would produce a different outcome; and 4) it is not cumulative only or merely impeaching the credibility of a witness.

*Hancock v. Shook*, 100 S.W.3d 786, 798 (Mo. banc 2003).

The circuit court did not abuse its discretion in overruling Central Trust's motion because the newly discovered evidence could not produce a different outcome. The only new evidence proffered by Central Trust was the contents of the safe deposit box, which was 39 pages of documents detailing information about Central Trust's clients and a cell phone containing the contact information of roughly 200 of Central Trust's clients. Central Trust has not supported the allegation that SignalPoint had access to the safe deposit box or its contents. Nor has it linked this more detailed evidence of the client list to SignalPoint in any way, and the new information has no bearing on whether SignalPoint misappropriated the client list. Even considering the new evidence, there still would be no genuine issue of material fact as to the misappropriation claim or either of Central Trust's other claims against SignalPoint. The circuit court did not abuse its discretion in overruling the motion for reconsideration and for a new trial.

## Conclusion

There is no genuine issue of material fact as to Central Trust's claim that SignalPoint misappropriated its client list. Central Trust failed to support the allegation that SignalPoint ever had access to the client list with citation to the record that was considered by the circuit court. Further, Central Trust failed to plead an agency or employment relationship between SignalPoint and Kennedy, so as to state a claim based on vicarious liability. There is no

17

genuine issue of material fact as to the claim of tortious interference with business relations because the misappropriation claim fails, and the claim of civil conspiracy is moot because Central Trust voluntarily dismissed the other two defendants from the case. The circuit court did not abuse its discretion in overruling SignalPoint's motions for reconsideration of summary judgment and for a new trial due to newly discovered evidence because the newly discovered evidence could not produce a different outcome. The judgment of the circuit court is affirmed.

_____
Zel M. Fischer, Judge

Breckenridge, Stith, Draper, Wilson and
Teitelman, JJ., and Bickel, Sp.J., concur.
Russell, C.J., not participating.