**WESTERN BLUE PRINT COMPANY, LLC, Respondent,**

v.

**Myrna ROBERTS, et al., Appellants.**

No. SC 91831.

Supreme Court of Missouri, En Banc.

April 17, 2012.

Rehearing Denied July 3, 2012.

David J. Moen, an attorney in Jefferson City, for Roberts.

J. Kent Lowry, Scott T. Jansen, Armstrong Teasdale, Jefferson City, Brent Vannoy, Donald W. Gould II, Johnson De-Luca Kurisky & Gould PC, Houston, TX, for Respondent.

GEORGE W. DRAPER III, Judge.

Myrna Roberts (hereinafter, "Myrna")[1], Mel Roberts (hereinafter, "Mel"), DocuCopy, LLC, and Graystone Properties LLC (hereinafter and collectively, "Appellants") appeal from the circuit court's judgment after a jury entered a verdict against Appellants on Western Blue Print Company LLC's (hereinafter, "Western Blue") petition for damages. Appellants' first four points allege the circuit court erred in failing to grant their motion for directed verdict or judgment notwithstanding the verdict, arguing Western Blue failed to make a submissible case that: (1) Myrna breached her fiduciary duty to Western Blue; (2) Myrna tortiously interfered with Western Blue's ability to renew one of its contracts; (3) Myrna committed computer tampering pursuant to section 569.095, RSMo 2000[2]; and (4) Mel civilly conspired with Myrna to compete directly against Western Blue. Finally, Appellants argue the circuit court abused its discretion in awarding Western Blue attorneys' fees in the amount of $224,489. Since we hold Myrna did not have a fiduciary duty to Western Blue in her role as a division vice

---

1. We respectfully refer to the parties by their first names for the sake of clarity.

2. All statutory references are to RSMo 2000 as updated by RSMo. Supp.2010.

president, the judgment is affirmed in part, reversed in part, and the case is remanded.

### Factual and Procedural History

When reviewing the denial of a motion for judgment notwithstanding the verdict (JNOV), the evidence is reviewed in the light most favorable to the jury's verdict. *All American Painting, LLC v. Financial Solutions and Associates, Inc.*, 315 S.W.3d 719, 720 (Mo. banc 2010). The facts taken in the light most favorable to the jury's verdict are as follows:

Western Blue is a document printing and management service company with its home office located in Kansas City, Missouri. In February 1999, Western Blue hired Myrna as a branch manager tasked with opening a branch office in Columbia. Myrna did not sign an employment contract and was not restricted by a non-compete agreement. As the branch manager, Myrna's responsibilities included hiring, managing, and firing personnel, overseeing production, developing customer relationships, and procuring sales.

Myrna was promoted to division vice president in August 2004. As a division vice president, Myrna attended executive meetings that discussed corporate strategy and planning. Myrna was exposed to profit and loss statements, including information about revenues, costs, profits, and employee salaries. Myrna was involved in decisions regarding equipment and material costs, which Western Blue considered proprietary, confidential, and part of its "secret recipe." Myrna had discretion over client pricing, authority to sign contracts on Western Blue's behalf, and an expense account without a specific budget so that she could travel and entertain clients as needed.

Myrna procured and oversaw a contract with the University of Missouri wherein Western Blue provided construction document print distribution services for the university's renovation projects. This contract was the largest contract out in the Columbia branch and was coupled with a contract with the State of Missouri, which represented approximately half of the value of the university contract. A condition of the university contract required Western Blue to hire a subcontractor that was a certified minority business enterprise (MBE) or a women's business enterprise (WBE).

While Myrna was employed at Western Blue, Mel owned and operated Graystone Properties, a real estate investment company. In late 2003, Mel approached one of his mortgage specialists, Micki Marrero (hereinafter, "Marrero"), about opening a business that would be certified as a WBE to provide reprographic services. Despite Marrero's lack of experience in the reprographics business, she agreed after meeting with Mel and Myrna to discuss her salary and training. DocuCopy was launched, naming Marrero as a 51 percent owner and Graystone Properties as a 49 percent owner. DocuCopy operated in the building next to Western Blue's office where Mel maintained offices for his other businesses. Acting on Western Blue's behalf, Myrna hired DocuCopy as a subcontractor for the university contract. DocuCopy eventually received its WBE certification in March 2005.

During this time, Western Blue, in conjunction with the university, was developing a secure document process that implemented a bar code system to track the documents provided to the university. Myrna worked closely with university personnel to develop this process while she managed the contract. Western Blue's contract with the university was up for renewal in mid–2006. Western Blue successfully bid on the contract the previous

two times the university solicited bids. Myrna was in control of the strategic planning for renewal of the university contract. Myrna spoke with a university representative about the specifications of the new contract in an attempt to gain an advantage in the bidding process. During one conversation regarding the bidding process, Myrna indicated to other Western Blue employees that she had the university contract "locked up."

Western Blue executives initially believed its relationship with DocuCopy was based solely upon its subcontractor arrangement under the university contract. However, Vince Pingel (hereinafter, "Pingel"), managing director of Western Blue, launched an investigation into the relationship when he and Western Blue's chief financial officer noticed financial irregularities in DocuCopy's billing. Western Blue's chief financial officer asked Pingel to determine who owned and operated DocuCopy, how the relationship between the two companies was formed, and if Western Blue's employees were performing work for DocuCopy while on Western Blue's payroll.

In July 2005, Pingel discussed this issue with Mel and Myrna. Pingel asked Myrna if she had any ownership or equity interest in DocuCopy, to which she replied, "No." Myrna denied deriving any financial or monetary benefit from DocuCopy. When asked if she would sign a document attesting to her answers, Myrna said, "Absolutely." Mel did not speak during this questioning or indicate he had any connection with DocuCopy. Myrna also answered email inquiries from Western Blue's chief financial officer regarding the relationship between Western Blue, Graystone Properties, and DocuCopy. Myrna indicated in the email that the ownership of Graystone Properties was "Michael Potter (Kristin Craver)" and DocuCopy was "Cherie Rutter (Amber Soper)." Mel provided this information. At no point did Appellants disclose their interest in DocuCopy to anyone at Western Blue.

In February 2006, American Reprographics Company Inc. was in the process of purchasing Western Blue. In connection with the sale, Pingel approached Myrna about signing an employment agreement that contained a non-compete clause. Myrna and Mel met with Pingel to negotiate the terms of the agreement. They were concerned with the geographic and time limitation placed on Myrna competing against Western Blue in the reprographics business if she left its employ. Myrna also inquired about purchasing the Columbia branch, but her offer was rejected. Later that month, another Western Blue employee saw Myrna leave the office after hours with several large boxes purportedly full of files.

In March 2006, Myrna decided she was not going to sign the employment agreement and believed Western Blue would terminate her employment as a result. Myrna and Mel began meeting with Western Blue employees after hours to recruit them to work for DocuCopy. Myrna directed Western Blue employees to leave without notice and expressed her confidence that DocuCopy would submit the winning bid on the university contract later that summer. Several Western Blue employees accepted Myrna's offer, staggering their departures from Western Blue during the last week of March.

On March 31, 2006, Myrna phoned Pingel and informed him she would not sign the employment agreement. She left her corporate laptop and office keys at Western Blue's Columbia office and did not return. At this point, the entire Columbia office, save two employees, left their employment with Western Blue without notice and began working for DocuCopy.

When Pingel arrived in Columbia to assess the situation, he secured Myrna's laptop and attempted to evaluate the Columbia branch's ability to complete the jobs that were in progress for its clients, including the university's contract. Pingel stated there was nothing left in Myrna's office that would enable him to get the office operational again after all of the employees left. Pingel testified it took a large amount of time to reconstruct the data and determine the status of their contractual obligations. As a result, Western Blue faced significant challenges in closing out their contractual obligations with the university after Myrna left.

The university solicited bids for the renewal of its contract in June 2006. DocuCopy, Western Blue, and two other companies submitted proposals for the contract. The proposals were marked confidentially and evaluated anonymously. A university representative testified DocuCopy and Western Blue's submissions were "very close." However, DocuCopy's submission was awarded the contract. A university representative indicated that even if Western Blue had received the highest score, she would have had reservations about its ability to perform under the contract because of the customer service issues that arose after Myrna left Western Blue. As a result of losing the university contract, Western Blue also lost the State of Missouri contract and was forced to close its Columbia branch office.

Western Blue filed a nine-count petition against Appellants alleging, *inter alia*, breach of fiduciary duties, tortious interference with a valid business expectancy, computer tampering, and civil conspiracy. At the close of Western Blue's case, Appellants moved for directed verdict on all of the counts, which the circuit court overruled. The jury returned a verdict in favor of Western Blue on each of the claims

submitted and awarded a verdict totaling $600,000. After trial, the circuit court awarded Western Blue $224,489.18 in attorneys' fees pursuant to section 537.525.2. Appellants moved for JNOV and for a new trial; the circuit court overruled these motions. Appellants appealed. After opinion by the court of appeals, this Court granted transfer. *Mo. Const. art. V, sec. 10.*

## Standard of Review

Four of Appellants' points on appeal challenge the circuit court's judgment overruling their motion for directed verdict or JNOV. The standard of review of the denial of a JNOV is essentially the same as the overruling of a motion for directed verdict. *Klotz v. St. Anthony's Medical Center*, 311 S.W.3d 752, 769 (Mo. banc 2010). "A case may not be submitted unless each and every fact essential to liability is predicated on legal and substantial evidence." *Moore v. Ford Motor Co.*, 332 S.W.3d 749, 756 (Mo. banc 2011) (quoting *Investors Title Co. v. Hammonds*, 217 S.W.3d 288, 299 (Mo. banc 2007)). To determine whether the evidence was sufficient to support the jury's verdict, an appellate court views the evidence in the light most favorable to the verdict and the plaintiff is given the benefit of all reasonable inferences. *Keveney v. Missouri Military Academy*, 304 S.W.3d 98, 104 (Mo. banc 2010). This Court will reverse the jury's verdict for insufficient evidence only where there is a complete absence of probative fact to support the jury's conclusion. *Klotz, supra.*

## Breach of Fiduciary Duty

Appellants argue the circuit court erred when it overruled their motions for directed verdict and JNOV because Western Blue failed to make a submissible case on its claim for breach of fiduciary duty on two grounds. First, Appellants allege

Myrna was not an officer or director of Western Blue and owed Western Blue no fiduciary duty. Second, Appellants claim it is not unlawful for a key employee to take steps to open a competing business while employed with the employer against which she plans to compete, nor is it unlawful to fail to disclose that plan to the employer.

*(1) Fiduciary Duty*

■■ "When breach of fiduciary duty is asserted as a tort claim, as here, the proponent must establish that a fiduciary duty existed between it and the defending party, that the defending party breached the duty, and that the breach caused the proponent to suffer harm." *Zakibe v. Ahrens & McCarron, Inc.,* 28 S.W.3d 373, 381 (Mo.App. E.D.2000). Whether a fiduciary duty exists is a question of law, while the breach of that duty is for the trier of fact to decide. *Scanwell Freight Express STL, Inc. v. Chan,* 162 S.W.3d 477, 481 (Mo. banc 2005). Appellants argue Western Blue failed to establish the existence of a fiduciary duty because Myrna was an at-will employee who was not restricted by a non-compete agreement.

■ Every employee owes his or her employer a duty of loyalty. *Scanwell,* 162 S.W.3d at 479. *See also Nat'l Rejectors Inc. v. Trieman,* 409 S.W.2d 1, 41 (Mo. banc 1966) and *Rest. (3d) Agency sec. 8.01. Scanwell* left open the question of whether or to what extent an employee owes the employer a fiduciary duty separate from the duty of loyalty. *Scanwell, supra.* Western Blue abandoned its separate claim of breach of loyalty against Myrna at trial in favor of pursing its breach of fiduciary duty claim only. Hence, the discussion will focus on this specific issue.

■ Missouri law is clear that officers and directors of public and closely held corporations are fiduciaries because they occupy positions of the highest trust and confidence and are required to exercise the utmost good faith when using the powers conferred upon them to both the corporation and their shareholders. *Gieselmann v. Stegeman,* 443 S.W.2d 127, 136 (Mo. 1969); *Waters v. G & B Feeds, Inc.,* 306 S.W.3d 138, 146 (Mo.App. S.D.2010). Myrna was not an officer or director of Western Blue, but held the title of division vice president. Western Blue argues that although Myrna was an at-will employee, she operated as a "de facto officer" causing a fiduciary duty to arise because she was vested with broad control and responsibility over the Columbia branch office.

In *Walter E. Zemitzsch v. Harrison,* 712 S.W.2d 418 (Mo.App. E.D.1986), the court held a sales manager who was promoted to vice president of a closely held corporation, who had limited authority, did not have a fiduciary duty to refrain from competing with his former employer. *Id.* at 422. *Zemitzsch* distinguished its outcome from the holding in *Opie Brush Company v. Bland,* 409 S.W.2d 752 (Mo.App.1966), where the court found a 25 percent shareholder, vice president, and director of the corporation had a fiduciary duty. *Id.* In *Trieman,* this Court concluded it was "not concerned with the activities of top echelon corporate officials" when it held employees who later entered into direct competition with their former employer did not have a duty to refrain from competition because they did not possess discretionary authority over the corporation. *Trieman,* 409 S.W.2d at 37. These employees included a sales manager, a purchasing agent, and a branch office manager. *Id.*

Myrna exercised a substantial degree of control over the day-to-day operations of the Columbia branch in her capacity as division vice president. However, the Columbia branch office comprised merely 5 percent of Western Blue's total business

operations. As such, Myrna was not within the "top echelon of corporate officials" when carrying out her job duties, nor was her authority so substantial that she was free to disregard Western Blue's directives as to how she performed those duties.

Despite the size of the Columbia branch, Western Blue argues Myrna was privy to a host of information regarding its internal operations and production that caused a confidential relationship to develop between them. Specifically, Western Blue points to Myna's access to profit and loss statements, information about revenues, costs, profits, and employee salaries, and her involvement in decisions regarding equipment and material costs, which Western Blue considered proprietary, confidential, and part of its "secret recipe."

 Generally, "an employer-employee relationship, without more, is insufficient to cause a confidential relationship to exist as to knowledge naturally acquired during employment." *Zemitzsch,* 712 S.W.2d at 421. To establish a confidential relationship between an employer and an employee, "[t]here must be either an express understanding as to the confidential nature of the information or it must be acquired under such circumstances that the employee must necessarily be aware of the confidence reposed in him." *Id.* (quoting *Trieman,* 409 S.W.2d at 41).

The employer in *Zemitzsch* raised a similar argument, which was rejected. The court found that while the vice president was privy to information relating to the employer's operations, costs, profit figures, pricing structures, source of raw material, timing of production, and identity of personnel, this information was not "entrusted solely" to him, and as such, it did not demonstrate a confidential relationship existed. *Zemitzsch,* 712 S.W.2d at 421. The employer conceded the vice president was not asked and did not agree to keep certain business information secret. *Id.* The court also found the information the vice president possessed regarding the customers was known or easily obtainable by others. *Id.*

This argument also failed in *Trieman.* This Court found the employer failed to take any steps at its plant to keep matters secret or confidential because none of the personnel were asked to sign a non-compete agreement. *Trieman,* 409 S.W.2d at 22. This Court stated, "The information of which the individual defendants made use was general information obtained in the ordinary course of their employment, not information gained in confidence in the course of a specific agency...." *Id.* at 27.

Likewise, Myrna gained her knowledge and expertise through the general course of her employment. She was not restricted by a non-compete agreement, and she was not asked to maintain the alleged confidential nature of the information she obtained through her work at Western Blue. Much of the information entrusted to her was also entrusted to other individuals, like the vice president in *Zemitzsch.*

Finally, Western Blue failed to provide this Court with any case law from any other jurisdiction that has held that an at-will employee who is not subject to a non-compete agreement and is neither an officer, director, partner or member of a limited liability corporation owes a fiduciary duty to his or her employer. This Court declines to extend the law of fiduciary duty as Western Blue suggests to include at-will employees who are not constrained by a non-compete agreement under the particular facts of this case and this state's precedent.

*(2) Duty not to Compete*

 Western Blue further argues Myrna's actions in preparing and directly competing with Western Blue through the

formation and operation of DocuCopy support its claim that she breached a fiduciary duty. When resolving this issue, there are two conflicting public policies, which were set forth in *Trieman:*

> On the one hand there is the deeply imbedded tradition that favors the protection of a person's property interest in his [or her] business from unfair competition. What a person has labored for should be protected from wrongs by others. On the other hand there is the equally strong, if not stronger policy which favors free competition in the economic sphere of our society. As a corollary[,] a person has the right to improve [one's] socioeconomic status, even if the resulting effect is somewhat detrimental to the business interest of [the] former employer. It is necessary that there be a balancing of the equities between these two rights, for if the former is carried to its extreme it will deprive a [person] of his [or her] right to earn a living; while conversely, the latter right if unchecked, would probably make a mockery of the fiduciary concept, with its concomitants of loyalty and fair play.

*Trieman,* 409 S.W.2d at 39 (quoting Comment, *The Obligation of a High–Level Employee to his Former Employer: The Standard Brands Case,* 29 U. of Chi. L.Rev. 339, 351–52 (1962)). "Ordinarily this balance heavily favors the business starting up, but it can be upset by evidence of misconduct on the part of the individual involved." *Zemitzsch,* 712 S.W.2d at 421.

▉ In *Trieman* and *Scanwell,* this Court held employees, while employed, must not act contrary to the employer's interests, including engaging in direct competition with the employer until their employment is terminated. *Trieman,* 409 S.W.2d at 41; *Scanwell,* 162 S.W.3d at 479. *Trieman* states:

The law recognizes that employees may agree among themselves to compete with their then employer upon termination of their employment. Such employees are not limited merely to so agreeing during their employment with the employer with whom they intend to compete. They may plan and prepare for their competing enterprises while still employed. If such right is to be in any way meaningful for an employee not under contract for a definite term, it must be exercisable without the necessity of revealing the plans to the employer.

*Id.* at 27 (citations omitted). Therefore, "[a]n employee may leave his [or her] employment and establish a new enterprise in competition with the former employer, absent a valid restrictive covenant therefor, or breach of a confidential relationship, and in connection therewith utilize his [or her] knowledge, memory, skill and experience gained in former employment." *Id.* at 51.

▉ However, "a breach arises when the employee goes beyond the mere planning and preparation and actually engages in direct competition, which by definition, is to gain advantage over a competitor." *Scanwell,* 162 S.W.3d at 479. Activities that constitute a breach of the duty of loyalty in this respect include using confidential information peculiar to the employer's business, soliciting customers before the end of the employment or other acts that result in direct competition. *Id.* at 480. Western Blue makes several claims that Myrna went beyond merely preparing to compete with Western Blue and that this conduct supports its claim of breach of fiduciary duty.

First, Myrna was not bound by a noncompete agreement with Western Blue, and no confidential relationship was established. Myrna was not in the "top echelon

of corporate officials" while carrying out her duties as division vice president. In *Trieman*, the Court held "the law did not require persons in the positions of the individual defendants ... to notify their employers of their intention to enter into competition with them upon termination of their employment." *Trieman*, 409 S.W.2d at 37.

Second, Myrna did not solicit any of Western Blue's customers prior to ending her employment. It is undisputed Myrna approached Western Blue's customers after she began working for Docu-Copy. This contact, in and of itself, does not support Western Blue's claim for a breach of fiduciary duty. In *Zemitzsch*, the vice president was the sole account representative for one of the employer's major customers and had "great discretion" in all areas of handling the account. *Zemitzsch*, 712 S.W.2d at 420. After the vice president left his employer and started his competing company, the major customer followed the vice president to his new company. *Id.* The employer argued the vice president breached his fiduciary duty as a corporate officer and his confidential relationship with the employer. The court recognized, "[i]n the sales industry the goodwill of a customer frequently attaches to the employer's sales representative personally; the employer's product becomes associated in the customer's mind with that representative." *Id.* at 421–22 (quoting *Cont'l Research Corp. v. Scholz*, 595 S.W.2d 396, 401 (Mo.App. E.D.1980)). While these "customer contacts" are protectable, they are not protectable under a theory of confidential relationship or trade secret. *Zemitzsch*, 712 S.W.2d at 422. *Zemitzsch* acknowledged, "Because sales personnel may 'exert a special influence over that customer and entice that customer's business away from the employer,' the proper means of protection is a non-com-

petition agreement." *Id.* (quoting *Cont'l Research Corp.*). *Zemitzsch* held an employee should not be held liable for the company's failure to take precautions to protect this information if it deems it confidential. *Id.* Similarly, Myrna is not liable for Western Blue's failure to protect its customer contacts, especially with clients as vital to its operation as the university and the State of Missouri.

Third, Myrna and Mel formed DocuCopy well before Myrna terminated her employment with Western Blue and enlisted other individuals to hide their activities. However, the Court in *Trieman* found no breach of fiduciary duty when those employees specifically set up a dummy corporation to evade discovery by their current employer, stating, "[T]he use of dummy incorporators is not necessarily a badge of fraud or bad faith." *Id.* at 28.

Myrna's status as an at-will employee not bound by a non-compete agreement foreclosed her from owing Western Blue a fiduciary duty. Moreover, Myrna's steps in preparing and planning to compete with Western Blue after her employment were not such that required her to notify Western Blue of her intentions or resulted in a breach of fiduciary duty. Therefore, the circuit court erred in overruling Appellant's motion for directed verdict or JNOV on Western Blue's claim for breach of fiduciary duty. Appellants' first point is granted.

### Tortious Interference

Appellants argue the circuit court erred in overruling their motions for directed verdict and JNOV because Western Blue failed to make a submissible case on its claim for tortious interference with a valid business expectancy related to the renewal of the university contract. Appellants claim Western Blue failed to demonstrate it had a valid business expectancy with

respect to its bid in that Myrna was privileged to bid on the contract, and DocuCopy was awarded the contract for having a superior bid, not because of any wrongdoing on Myrna's part.

██ To prove a claim for tortious interference with a contract or business expectancy, the plaintiff must demonstrate: (1) a contract or a valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) absence of justification; and (5) damages resulting from defendant's conduct. *Healthcare Services of the Ozarks, Inc. v. Copeland,* 198 S.W.3d 604, 614 (Mo. banc 2006). It is necessary to determine whether Western Blue's expectancy that it would win the bid to renew the university contract was reasonable and valid under the circumstances presented. *Londoff v. Walnut Street Securities, Inc.,* 209 S.W.3d 3, 9 (Mo.App. E.D. 2006).

### (1) Valid Business Expectancy

██ First, Appellants argue Western Blue had no valid business expectancy in the renewal of the university contract because the university contract was "up for grabs" in that it was a public competitive bid process. A business expectancy need not be based on an existing contract. *BMK Corp. v. Clayton Corp.,* 226 S.W.3d 179, 190 (Mo.App. E.D.2007). "A probable future business relationship that gives rise to a reasonable expectancy of financial benefit is enough." *Stehno v. Sprint Spectrum, L.P.,* 186 S.W.3d 247, 251 (Mo. banc 2006). Moreover, Missouri courts have recognized that a regular course of prior dealings suggests a valid business expectancy. *Sloan v. Bankers Life & Cas. Co.,* 1 S.W.3d 555, 565 (Mo.App. W.D.1999).

Western Blue presented sufficient evidence to demonstrate it had a reasonable, valid business expectancy that it would win the university contract bid before Myrna left and went to work for DocuCopy. The record reflects Western Blue successfully bid on the contract the previous two times the university solicited bids and performed well fulfilling its obligations. Myrna managed the contract on Western Blue's behalf and developed a close working relationship with university officials during that time. Myrna spoke with a university representative about the specifications of the new contract in an attempt to gain an advantage in the bidding process for Western Blue. In her capacity as division vice president, Myrna was involved intimately in developing the secure document process to track the documents provided to the university. Myrna told other Western Blue employees she had the university contract "locked up" just a few months before leaving.

When Myrna left Western Blue, she took with her specialized knowledge of the secure document process and disrupted Western Blue's ability to perform under the current contract. As a direct result of Myrna's actions, DocuCopy was awarded the university contract and the State of Missouri contract. These contracts comprised the bulk of the revenue for Western Blue's Columbia office, and without it, the branch office was forced to close. While Appellants make much of the fact that the evaluation process was anonymous, a university official testified that had Western Blue won the bid, she would have grave reservations about its ability to perform given the decline in customer service it provided after Myrna left.

### (2) Absence of Justification

██ Appellants also argue Western Blue failed to present sufficient evidence that Myrna lacked justification to submit a

competing bid on DocuCopy's behalf after leaving her employment with Western Blue. "Absence of justification refers to the absence of a legal right to justify actions taken." *Envirotech, Inc. v. Thomas*, 259 S.W.3d 577, 590 (Mo.App. E.D.2008) (quoting *Downey v. McKee*, 218 S.W.3d 492, 497 (Mo.App. W.D.2007)). A defendant cannot be held liable for interfering with a business relationship if he or she has an unqualified right to perform the act. *Rice v. Hodapp*, 919 S.W.2d 240, 245 (Mo. banc 1996). If the defendant has a legitimate interest, economic or otherwise, in the expectancy the plaintiff seeks to protect, then the plaintiff must show that the defendant employed improper means in seeking to further only his or her own interests. *Stehno*, 186 S.W.3d at 252. "Improper means are those that are independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or the common law." *Id.*

The record demonstrated that during the course of her employment with Western Blue, Myrna fostered an intimate working relationship with university officials responsible for drawing up the bid specifications. Myrna was integral in developing the secure document process with the university to manage the distribution of construction documents. Myrna exploited her relationship with the university officials by providing input on the criteria for the bid, which ostensibly gave Western Blue such an advantage that Myrna proclaimed the contract was "locked up."

Once Myrna rejected the employment contract from Western Blue, she convinced Western Blue employees to leave their jobs and work for DocuCopy, instructing them to stagger their departures without notice. Myrna assured these employees she would be able to procure the university

contract for DocuCopy to fund its operations. Pingel testified after Myrna and the other employees left without notice, it took a significant amount of time to assess the status of their projects, most importantly, the projects pending for the university contract.

Finally, the charge of computer tampering against Myrna certainly falls under the guise of improper means in that it is a wrongful act recognized by statute. Myrna's deletion of documents pertinent to the bid, specifically one document titled, "Competitive Edge for MU Contract Renewal 2006," hindered Western Blue's ability to bid successfully on the university contract. Moreover, Myrna's deletion of other documents impacted Western Blue's ability to complete its current contractual obligations to the university such that it negatively reflected on its bid in June 2006.

Western Blue presented sufficient evidence that Myrna engaged in improper means to procure the university contract on DocuCopy's behalf and that she tortiously interfered with Western Blue's valid business expectancy. The circuit court did not err in overruling Appellants' motion for directed verdict or JNOV on this claim. Appellants' second point is denied.

### Computer Tampering

 Appellants allege the circuit court erred when it overruled their motions for directed verdict and JNOV because Western Blue failed to make a submissible case on its computer tampering claim against Myrna. Section 537.525.1 permits the owner or lessee of the computer system or network to bring a civil action against any person who violates sections 569.095 to 569.099 for any compensatory damages incurred and attorney's fees. Section 569.095.1 provides that a person commits the crime of computer tampering if he or

she "knowingly and without authorization or without reasonable grounds to believe that he [or she] has such authorization:

(1) Modifies or destroys data or programs residing or existing internal to a computer, computer system, or computer network; or

(2) Modifies or destroys data or programs or supporting documentation residing or existing external to a computer, computer system, or computer network; or

(3) Discloses or takes data, programs, or supporting documentation, residing or existing internal or external to a computer, computer system, or computer network; or

(4) Discloses or takes a password, identifying code, personal identification number, or other confidential information about a computer system or network that is intended to or does control access to the computer system or network;

(5) Accesses a computer, a computer system, or a computer network, and intentionally examines information about another person;

(6) Receives, retains, uses, or discloses any data he [or she] knows or believes was obtained in violation of this subsection.

The jury was directed to enter a verdict for Western Blue if it found Myrna took Western Blue's data by deleting files from her corporate laptop computer or copying Western Blue's electronic information on to compact discs and did so knowingly and without authorization or without reasonable grounds to believe that she had such authorization. Appellants contend there was insufficient evidence to demonstrate Myrna, as opposed to some other person or entity, deleted information from her corporate laptop computer or that Myrna was not authorized to access, copy or delete information from her laptop.

### (1) Destroying Data

While the record reveals Western Blue's forensic computer analyst, Ted Swailes (hereinafter, "Swailes"), could not say with certainty who deleted these files, the trier of fact could make a reasonable inference that Myrna committed computer tampering. Pingel testified that he secured Myrna's corporate laptop after she left Western Blue's office on March 31, 2006. Pingel turned the laptop over to Western Blue's information technology department for analysis and later to Swailes for testing.

Swailes was asked to determine what documents and emails were deleted from Myrna's computer, and what documents, if any, could be retrieved. The laptop's operating system showed 47,203 files were deleted, with approximately 9,256 files deleted after March 30, 2006. Swailes testified the large number of documents affected indicated the deletion was not accidental. A substantial number of emails related to Myrna's customers and a contact management database application containing customer names, company names, contacts, telephone numbers, email addresses, sales activities, and related notes were deleted from Myrna's laptop. One of the key documents deleted was the "Competitive Edge for MU Contract Renewal 2006" document.

### (2) Retention of Compact Discs

It is undisputed Myrna left her employ with possession of two compact discs that contained Western Blue customer and business operations information. Appellants argue these compact discs were provided to Myrna in the regular course of business, and therefore, her possession of them could not be unauthorized. The compact discs contained many of the files that were deleted from Myrna's laptop and were not returned to Western Blue until

Myrna was compelled by court order. These files contained financial information and strategic, high-level competitive thinking that Pingel testified were confidential. While the jury could have inferred that Myrna was authorized to retain these copies because they were made in the regular course of business, an equally permissible inference is that she retained these files after deleting them from her laptop in an effort to undermine Western Blue's ability to bid successfully on the university contract, or conversely, to aid DocuCopy in making its bid, which would be an unauthorized purpose.

Thus, there was substantial evidence that Myrna knowingly deleted and/or copied computer data from Western Blue without authorization. The circuit court's judgment overruling their motion for directed verdict or JNOV on this issue was proper. Appellants' third point is denied.

### Civil Conspiracy

Appellants claim the circuit court erred in overruling their motions for directed verdict and JNOV because Western Blue failed to make a submissible case on its claim of civil conspiracy against Mel. Appellants argue Mel had no legal duty to Western Blue, Western Blue had no right to rely on the representations made by Mel, and there was no evidence Mel acted with any unlawful objective toward Western Blue.

Although civil conspiracy has its own elements that must be proven, it is not a separate and distinct action. *Breeden v. Hueser*, 273 S.W.3d 1, 13 (Mo.App. W.D.2008). "[R]ather, it acts to hold the conspirators jointly and severally liable for the underlying act." *8000 Maryland, LLC v. Huntleigh Fin. Services Inc.*, 292 S.W.3d 439, 451 (Mo.App. E.D.2009). "The gist of the action is not the conspiracy, but the wrong done by acts in further-ance of the conspiracy or concerted design resulting in damage to plaintiff." *Id.* (quoting *Royster v. Baker*, 365 S.W.2d 496, 499 (Mo.1963)). To demonstrate a civil conspiracy existed, Western Blue must show: (1) two or more persons; (2) with an unlawful objective; (3) after a meeting of the minds; (4) committed at least one act in furtherance of the conspiracy; and (5) Western Blue was thereby damaged. *Oak Bluff Partners, Inc. v. Meyer*, 3 S.W.3d 777, 781 (Mo. banc 1999). "In Missouri, if tortious acts alleged as elements of a civil conspiracy claim fail to state a cause of action, then the conspiracy claim fails as well." *Id.* "The term unlawful, as it relates to civil conspiracy, is not limited to conduct that is criminally liable, but rather may include individuals associating for the purpose of causing or inducing a breach of contract or business expectancy." *Lyn–Flex West, Inc. v. Dieckhaus*, 24 S.W.3d 693, 700–01 (Mo. App. E.D.1999).

There was ample evidence presented that supported Western Blue's civil conspiracy claim based upon proof of tortious interference with a valid business expectancy against Myrna. Mel's conduct in aiding Myrna to achieve this interference supports the claim of civil conspiracy against him. When Mel and Myrna formed DocuCopy in January 2004, Mel initially directed how DocuCopy would operate. Marrero communicated directly with Mel to avoid a conflict of interest with Western Blue. Mel advised Marrero that if anyone asked who owned DocuCopy, she should say she did not know, rather than indicate herself or Appellants. Mel relayed messages from Myrna to Marrero to provide Marrero with training on the equipment, assistance with client proposals, and guidance on billing, pricing, and ordering. After DocuCopy's initial bid for certification as a WBE was denied,

Marrero refused to resubmit certification paperwork she believed to be misleading. Despite having a 51 percent ownership interest in DocuCopy, Mel fired Marrero for this refusal.

Mel hired his assistant, Cheryl Rutter (hereinafter, "Rutter"), to assume Marrero's position after threatening to fire her if she refused. Mel and Myrna instructed Rutter to "run everything" through Myrna, including the WBE certification paperwork. Rutter had no autonomy to make any decisions without input or approval from Mel and Myrna, despite her majority ownership. DocuCopy obtained WBE certification through Rutter's application. However, shortly after obtaining certification, Mel terminated Rutter, telling her she was not running DocuCopy appropriately or meeting their expectations. Mel paid Rutter $51 for her 51 percent ownership of DocuCopy and instructed Rutter that she could not tell anyone that she no longer worked for DocuCopy.

Hence, Mel committed acts in furtherance of the tortious interference claim by: (1) directing Marrero and Rutter to conceal the true ownership of DocuCopy; (2) remaining silent in the face of Pingel's questioning about DocuCopy's true ownership; and (3) providing Myrna with misleading answers about Graystone Properties and DocuCopy's ownership that she in turn gave to Western Blue's chief financial officer. The circuit court did not err in overruling Appellants' motion for directed verdict or JNOV on this claim. Appellants' fifth point is denied.

### Attorneys' Fees

■ Finally, Appellants claim the circuit court erred in denying their motion for new trial with respect to the award of attorneys' fees related to the computer tampering claim. Appellants argue the circuit court's award was not based solely on the time and expenses incurred to liti-gate the computer tampering claim, but rather, was based upon a mere estimate.

■ Section 537.525.2 permits the circuit court to award reasonable attorneys' fees to a prevailing plaintiff in a civil action for computer tampering. *See also, Mihlfeld & Associates, Inc. v. Bishop & Bishop, L.L.C.,* 295 S.W.3d 163, 176 (Mo. App. S.D.2009). When an award of attorneys' fees is authorized for one particular claim among many, a circuit court must segregate the claims, despite the difficulty segregation may present. *See O'Brien v. B.L.C. Ins. Co.,* 768 S.W.2d 64, 71 (Mo. banc 1989). The circuit court is deemed an expert at fashioning an award of attorneys' fees and may do so at its discretion. *Howard v. City of Kansas City,* 332 S.W.3d 772, 792 (Mo. banc 2011). The circuit court that "tries a case and is acquainted with all the issues involved may 'fix the amount of attorneys' fees without the aid of evidence.'" *Essex Contracting, Inc. v. Jefferson County,* 277 S.W.3d 647, 656 (Mo. banc 2009) (quoting *Nelson v. Hotchkiss,* 601 S.W.2d 14, 21 (Mo. banc 1980)). "To demonstrate an abuse of discretion, the complaining party must show the trial court's decision was against the logic of the circumstances and so arbitrary and unreasonable as to shock one's sense of justice." *Howard, supra* (quoting *Russell v. Russell,* 210 S.W.3d 191, 199 (Mo. banc 2007)).

The jury found Myrna liable for computer tampering, and this Court has affirmed that finding on appeal. After the trial, Western Blue filed an *in camera* motion for attorneys' fees pursuant to section 537.525.2. Western Blue admitted at the hearing that all of the causes of action arose from a common, intertwined set of facts, but that a "big part" of the evidence concerned the documents that were deleted from Myrna's laptop and the files that were burned onto compact discs. The circuit court received testimony and billing

statements that detailed the work Western Blue's attorneys performed regarding this claim. Appellants' attorneys argued the circuit court would be unable to segregate the fees to determine which ones were accrued for the computer tampering charge. The circuit court agreed, stating:

I do think there is an issue of are the issues so intertwined with one another that you can't segregate, and that on the one hand I think there is intertwining going on, and on the other hand I think I'm going to be looking at that issue to see what I can do to unintertwine [sic] it in some fashion.... I think that you ... have identified the issue that the Court is going to be forced to do, to try to look and see what goes with what.

The circuit court acknowledged it was unlikely the bills offered would identify specific work as it corresponded to the computer tampering claim. The testimony presented by the attorneys also demonstrated difficulty in segregating the fees for the computer tampering claim.

The record reveals the computer tampering claim was a large part of the preliminary injunction hearing, the temporary restraining order, the preparation of the petition, and a large part of the instruction conference since the computer tampering charge served as a common thread of the litigation. The circuit court asked Western Blue's local attorney to estimate what percentage of his fees were unrelated to the computer tampering charge. He stated, "Sixty percent probably.... Forty percent of the time that's represented by the bill would have included work that included computer tampering. That's an estimate because the Court asked me to guess." When the circuit court asked Western Blue's Texas attorney what his estimate was, he stated the answer was unclear. He testified he had an associate review the billings and flag each instance that referred to the computer tampering claim. Counsel concluded, "I would say

where we were directly working on computer tampering or deletion of information off of a laptop or the CDs, without regard to how an action is described in the fee bills, to be easily 70 percent of the case ... because so much of the information that was deleted or taken away went to so many of the other claims."

The circuit court found the computer tampering claim was the most common issue to all of the submitted claims, but recognized it was permitted to only award fees for that specific claim. The circuit court awarded local counsel $51,635.40 in fees, which was 40 percent of the total submitted and awarded Texas counsel $172,853.78, which was 70 percent of the total submitted. The record demonstrates the circuit court attempted to segregate the fees incurred for the computer tampering claim after receiving testimony from Western Blue's attorneys' and evaluating the bills submitted. The circuit court did not abuse its discretion in fashioning the award. Appellants' fourth point is denied.

### Conclusion

The circuit court's judgment finding Myrna owed Western Blue a fiduciary duty was erroneous, and the judgment is reversed in that respect. The circuit court's judgment in all other respects is affirmed including finding Appellants' guilty of tortious interference with a valid business expectancy, computer tampering, civil conspiracy, and the award of attorneys' fees which were supported by substantial evidence. The case is remanded.

TEITELMAN, C.J., RUSSELL, BRECKENRIDGE, FISCHER and STITH, JJ., and ATWELL, Sp.J., concur.

PRICE, J., not participating.