**CONSOLIDATED GRAIN & BARGE, CO., a corporation, Plaintiff–Appellant/Respondent,**

v.

**Mark Phillip HOBBS, Individually, Defendant–Respondent/Cross–Appellant,**

and

**Mark Phillip Hobbs, Personal Representative of the Estate of George Phillip Hobbs, Deceased, Defendant.**

**Nos. SD 31558, SD 31593.**

Missouri Court of Appeals, Southern District, Division One.

Jan. 31, 2013.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 20, 2013.

Application for Transfer to Supreme Court Denied April 30, 2013.

Tom K. O'Loughlin, II, Cape Girardeau, MO, for Appellant/Respondent.

Richard G. Steele, Adam E. Hanna, Cape Girardeau, MO, for Respondent/Cross–Appellant.

NANCY STEFFEN RAHMEYER, J.

Plaintiff, Consolidated Grain & Barge, Co. ("Consolidated"), and Defendant, Mark Phillip Hobbs in his individual capacity ("Mark Hobbs"), appeal from the trial court's judgment. Following a trial to the court, the trial court entered a judgment that found in favor of Consolidated on its claims against Mark Hobbs for (1) an im-

plied contract based on fraud or unjust enrichment, and (2) fraudulent misrepresentations, but denied Consolidated's claim that Mark Hobbs was a partner with his father, George Phillip Hobbs ("George Hobbs").[1] In light of the cross appeals, Consolidated is treated as the Appellant in this appeal pursuant to Rule 84.04(j).[2] We reverse the trial court's judgment to the extent of its rulings in favor of Consolidated because the trial court misapplied the law in so ruling, and affirm the trial court's judgment denying Consolidated's claim that Mark Hobbs was a partner with George Hobbs because Consolidated failed to meet its burden of persuasion on that theory of recovery.

### Facts and Procedural History

In a first amended petition filed in July 2009, Consolidated alleged in Count I that the "equitable powers" of the trial court authorized the trial court to impose a "constructive trust" on "all assets" received by Mark Hobbs from George Hobbs "on an implied, contract (quasi-contract)," and that "Mark Hobbs will be unjustly enriched at the expense of Consolidated unless the [trial court] exercises its equitable powers." Consolidated further alleged in Count II that Mark Hobbs "[misled] Consolidated by negotiating with them to satisfy the outstanding contracts, suggesting he would deliver grain, by suggesting he would roll the wheat contracts, all of which representations were false, were known to be false, [and] reasonably relied upon by Consolidated," and that "[a]s a direct re-

sult of the misrepresentations, Consolidated did not file a timely claim in [George Hobbs'] Estate[.]" In Count V of a second amended petition, Consolidated alleged that Mark Hobbs and George Hobbs "were partners in a farming partnership," and that Mark Hobbs "is liable as a partner."

In his answer, Mark Hobbs asserted that Consolidated's claims under Counts I and II of its first amended petition were barred by the probate non-claim statutes of limitation in sections 473.360 and 473.444.

On the morning of the trial, both Consolidated and Mark Hobbs requested findings of fact and conclusions of law. The trial court took judicial notice of the probate division's court file for the Estate of George Phillip Hobbs. Counsel for Consolidated acknowledged that Consolidated was not alleging that Mark Hobbs "reached" an agreement to satisfy his father's outstanding contracts to deliver wheat, soybeans, and corn to Consolidated.

Viewed in accordance with our standard of review, the evidence at trial showed the following. George Hobbs is the father of Mark Hobbs. George[3] died on November 12, 2007. For a number of years before his death, George and Mark farmed the same land as share croppers, and split the income and expenses of that activity on their individual federal income tax returns in a way that was intended to minimize the total income taxes owed by the two men.

---

1. The judgment also found in favor of Mark Phillip Hobbs in his capacity as Personal Representative on "[a]ll matters," and dismissed Mark Phillip Hobbs in his capacity as Personal Representative. Further, Consolidated made claims against Mark Hobbs in addition to those set forth above, and the judgment denied or dismissed those claims. Consolidated does not appeal any of these rulings by the trial court.

2. All references to rules are to Missouri Court Rules (2012), and all references to statutes are to RSMo 2000, unless otherwise specified.

3. For clarity and ease of reading, we at times refer to individuals by their first name. We do not intend any disrespect in doing so.

The split of the income and expenses between the two men changed from year to year in order to minimize the total income taxes owed. The two men did not intend or desire to operate as a partnership, and no partnership tax return ever was filed.

Consolidated is a corporation that buys crops from farmers, takes delivery of those crops at facilities along the Mississippi River and a few other rivers in the Midwest, and then transports the crops by barge to New Orleans where Consolidated then sells the crops to others for export.

Before his death, George entered into several contracts with Consolidated for the delivery of wheat, soybeans, corn, and other crops on dates that turned out to be after his death. George entered into these contracts solely in his name. In each contract, Consolidated agreed to pay George a set price for the crops on delivery. Each contract was a "separate" contract.

After George's death, Mark delivered the crop called for under one contract,[4] but did not deliver the wheat, soybeans and corn called for under seven of these contracts.[5] When no crops were delivered under these seven contracts, Consolidated, in October 2008, purchased other wheat, soybeans, and corn to cover the contracts but was required to pay higher prices for the crops than the prices set in the contracts with George. In the aggregate, Consolidated paid $60,519.60 more for the crops than would have been required under the contracts with George. The contracts with George provided for interest and reasonable attorney fees in the event George breached the contract. The seven unfulfilled contracts had "shipment" dates in 2007, and January, June, July, August, September and November 2008. Also af-

ter George's death, the landlord for one of the farms George and Mark sharecropped terminated, or declined to renew, the lease for the farm. Mark sold wheat that had been planted shortly before George's death on this farm to another farmer. The termination of this lease left Mark with only one farm to sharecrop in 2008.

Murray Schwieger, an employee of Consolidated who dealt regularly and was "good friends" with George, attended George's wake. Courtney Blackburn, another Consolidated employee, also was "aware of [George's] death." Mark testified he told Murray he was the "executor" of George's estate in February 2008. Murray testified he did not remember Mark telling him he was the executor or otherwise in charge of George's estate.

Murray further testified as follows. At the wake, Mark "mentioned" to Murray that "we needed to have a conversation about his dad's contracts." In subsequent telephone conversations, Mark and Murray talked about "how we were going to handle the contracts. And I told him we have to work, see what we can do to work things out with him. He told me that he had intended to haul the grain to us.... We talked about him bringing the grain. Then he talked about not having enough." Murray also "talked to Mark all of the way a little here and there on rolling the contracts as well. He never did sign them." In late September 2008, Mark told Murray "he wasn't going to bring the grain" because he had been advised by counsel that "he didn't have to, he didn't have any liability because no claim had been filed in his dad's estate." Murray then contacted Consolidated's in-house legal counsel and,

---

4. From the transcript, it appears Mark may have delivered crops under two or three of his father's contracts with Consolidated, but the record is insufficient to confirm the deliveries.

5. In January 2008, Mark appears to have also sold milo and soybeans to Consolidated in Mark's own name. Later in 2008, Mark sold 2008 wheat and beans to Cargill.

in October 2008, Consolidated canceled George's seven unfulfilled contracts and sent a letter to Mark Hobbs notifying him of the cancellation and that Consolidated "would be invoicing them" for damages. At some point after George died, Murray told Mark that the landlords "should be responsible for a portion of those contracts as well."

Courtney Blackburn testified at deposition that he thought he was dealing with "George Hobbs Farms" when he was dealing with George. Nothing Mark said "induced" Courtney "not to file a claim" on behalf of Consolidated in George's probate proceeding.

At the time, Consolidated did not have an employee who was responsible for filing claims in the probate estates of deceased customers. Murray first became aware of the requirement that creditors of a decedent file a claim in the decedent's probate estate when he spoke to legal counsel after Mark informed him that Mark was not going to fulfill George's remaining contracts.

Mark testified that he never "indicate[d] to anybody at Consolidated" that he was going to perform George's contracts.

Following his father's death, Mark applied for and was granted letters of administration for his father's probate estate. At the time the letters of administration were granted, Mark knew that Consolidated was a potential creditor of George's. Notice of the grant of the letters of administration and the requirement that George's creditors file claims within six months from the date of first publication of the notice was published in a local newspaper. The first publication of the notice occurred on February 24, 2008. Mark did not otherwise notify Consolidated of the requirement that creditors file claims. In late September 2008, Mark informed Consolidated that he did not intend to fulfill

George's seven contracts that are at issue in this case, and that Consolidated at that point was barred from filing a claim in George's probate estate. On December 12, 2008, the probate division of the circuit court ordered that the property in George's probate estate be distributed to Mark and that Mark be discharged as Personal Representative. Consolidated never filed a claim for its loss on the contracts in George's probate estate, and first filed suit in this case on February 18, 2009. To Murray Schwieger's knowledge, Consolidated never looked at the inventory filed in George's probate estate until after November 12, 2008.

As viewed by the trial court, the evidence at trial showed that Mark omitted significant property from the inventory filed in George's probate estate, and took that property for himself. The omitted property included a half-interest in a "center pivot" that Mark sold in November 2008 for $25,000, a Farm Service Agency payment for the 2007 crop year, 2007 soybeans and milo for which Consolidated paid Mark about $27,000 in 2008 "[a]fter the first of the year," wheat on two separate farms that was planted a short time before George's death, and a lease for a signal tower placed on George's farmstead. Even with these omissions, all George's creditors who filed a claim in the probate estate were paid in full. And, the property listed in the inventory would have been sufficient to pay Consolidated's claim in full if it had been timely filed in the probate proceeding.

Based on this evidence, the trial court found in favor of Consolidated against Mark Hobbs individually on Counts I and II, and against Consolidated on Count V. On Count I, the trial court found that Mark failed to meet his fiduciary duty as personal representative of his father's probate estate to "make a 'perfect' inventory

of [his father's] assets," committed "constructive fraud as a fiduciary in the handling of [his father's] estate," in violation of section 472.013,[6] and received a "substantial benefit to which he was not otherwise entitled to the detriment of Consolidated."

On Count II, the trial court found Mark committed fraud in connection with his father's probate estate in violation of section 472.013, and committed common law fraud in connection with the seven contracts at issue in the case. Specifically, the trial court stated:

> In addition to the fraud in connection with the probate proceeding mentioned in this Court's decision on Count I, Murray had several discussions with Mark on how to handle the delivery and performance under the seven contracts. Mark delivered grain to Consolidated in August of 2008, after George died. Some of the sale proceeds of the grain were applied to George's contracts which are not at issue in this case. Consolidated deducted approximately $4,100.00 from the proceeds and set-off that sum for its losses on another contract. After that deduction Mark never delivered any more grain to Consolidated. Instead, Mark took the wheat and soybeans grown on the Helfrich Farms in 2008 and sold them at Bunge at a price higher than that provided in the seven contracts.

> Though he testified otherwise, Mark's responses to Consolidated's Requests for Admissions show that he knew Consolidated was a potential creditor in George's probate estate and that Mark "has sold agricultural commodities to elevators and purchasers of those commodities for years before his father died and was familiar with the general procedures related to the sale of agricultural commodities". Mark made no effort to notify Murray or Consolidated of the necessity to file a claim in George's probate estate. Mark knew that the first creditor publication was in February of 2008 and that as of August 24, 2008, it was too late to file a claim in George's probate estate. Only after the claims bar date, September of 2008, did Mark made [sic] it clear to Consolidated he would not deliver, roll or otherwise be responsible for the seven contracts.

> Consolidated reasonably relied on Mark's delivery of Hobb's grain under the contracts until after the claims bar date when Mark repudiated any obligations under the contracts. Mark never intended to perform the contracts from shortly after George's death. He intended, instead, to engage in the fraudulent probate proceeding mentioned in this Court's finding on Count I, to allay Consolidated's concerns about performance on the seven contracts until after the claims bar date, then renounce the contracts hoping to avoid liability and enhance Mark's receipt of assets from George's probate and non-probate estates.

> Section 472.013, previously quoted, as well as the common law provide remedies for constructive and fraudulent misrepresentation. In the case of 472.013, even if Mark were innocent of fraud, property or funds received by him may be recovered. He is not a bona fide purchaser. Accordingly, this Court finds Mark liable for damages under the fraud theory of Count II. (internal references to the record omitted)

On Count V, the trial court found "[t]he key inquiry is whether the parties had the intent to create a partnership," "[t]here

6. It appears this issue was tried by consent with the result that the issue is treated as if it had been raised in the pleadings pursuant to Rule 55.33(b).

was no written partnership agreement," and "[n]o expressed partnership existed," and then denied Consolidated's request for relief under Count V.

## Standard of Review

In a court-tried case, we must affirm the judgment of the trial court unless no substantial evidence supports it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *Johnson v. Estate of McFarlin*, 334 S.W.3d 469, 473 (Mo.App. S.D.2010).

A judgment is supported by substantial evidence when there is evidence from which the trier of fact can reasonably find all facts necessary to sustain the judgment. *Houston v. Crider*, 317 S.W.3d 178, 186 (Mo.App. S.D.2010). In determining whether there is substantial evidence, we view the evidence and reasonable inferences from the evidence in the light most favorable to the judgment, disregard all evidence and inferences contrary to the judgment, and defer to the trial court's credibility determinations. *Id.*

A judgment should be set aside as "against the weight of the evidence" only with caution and only when the reviewing court has a firm belief that the judgment is wrong. *Murphy*, 536 S.W.2d at 32; *Houston*, 317 S.W.3d at 186. Weight of the evidence refers to "weight" in probative value and not quantity or amount. *Houston*, 317 S.W.3d at 186. Weight of the evidence is determined by the evidence's effect in inducing belief in the proposition at issue when viewed in the context of all the evidence, and not by mathematics. *Id.*

> Thus, an against-the-weight-of-the-evidence challenge presupposes the threshold issue of the existence of substantial evidence supporting a proposition necessary to sustain a judgment, but, nevertheless, challenges the probative value of that evidence to induce belief in that proposition when viewed in the context of the entirety of the evidence before the trier of fact. Although consideration of probative value necessarily involves some consideration of evidence contrary to the judgment, we nevertheless defer to the trial court as the finder of fact in our determination as to whether that judgment is against the weight of the evidence. Accordingly, where the resolution of conflicting testimony is required to determine the merits of an against-the-weight-of-the-evidence argument, we defer to the trial court's credibility determinations in the same manner as in the resolution of a not-supported-by-substantial-evidence argument.

*Id.* (internal citations and quotations omitted).

## Analysis

### *Mark Hobbs' Appeal*

In his four points relied on, Mark Hobbs claims that the trial court erred in (1) granting Consolidated equitable relief because Consolidated had an adequate remedy at law in the form of a breach of contract claim against Mark's father's probate estate that was barred by a statute of limitations, (2) granting Consolidated relief for fraud in connection with his father's probate estate because Consolidated "did not rely" on the inventory for Mark's father's probate estate and "could not have been damaged" by omissions in the inventory, (3) granting Consolidated relief for fraud in connection with the contracts at issue because "the act of delivering grain does not constitute a false statement of existing fact[ ]" and Consolidated did not "have the right to rely on" that act "in choosing not to file a claim in [Mark's

father's probate] estate," and (4) granting Consolidated attorney fees.[7]

## Grant of Equitable Relief

In the trial court, Consolidated requested equitable relief based on its claim that a noncontractual obligation (i.e., a quasi or implied-in-law contract) should be imposed to prevent the unjust enrichment of George Hobbs and, ultimately, Mark Hobbs as an heir of George Hobbs' probate estate. *See Johnson*, 334 S.W.3d at 474 (discussing an implied-in-law contract); *US Bank National Assoc. v. Cox*, 341 S.W.3d 846, 853 & n. 7 (Mo.App. W.D. 2011) (stating that an action for unjust enrichment is based on a theory of quasi contract or contract implied in law). This claim arises from George Hobbs' failure to deliver crops to Consolidated required by seven contracts in George Hobbs' name alone. Consolidated alleges that failure, in some manner, resulted in the unjust enrichment of George and, through George, his heirs. The claim clearly is a claim against George's probate estate in the first instance, but was never filed in the probate proceeding even though Consolidated was (1) aware through its employees of George Hobbs' death shortly after George died, and (2) informed by Mark that he did not intend to fulfill his father's contracts that are at issue in this case more than one month before the one-year anniversary of his father's death.

As relevant in this case, section 473.444.1 provides in part:

> all claims against the estate of a deceased person ... whether due or to become due, absolute or contingent, liquidated or unliquidated, founded on contract or otherwise, which are not filed in the probate division ... shall become unenforceable and shall be forever barred against the estate, the personal representative, the heirs, devisees and legatees of the decedent one year following the date of the decedent's death, ... whether or not during such period a claimant has been given any notice, actual or constructive, of the decedent's death or of the need to file a claim in any court[.]

Section 472.010(3) further provides, as is relevant in this case, that " '[c]laims' include liabilities of the decedent which survive whether arising in contract, tort or otherwise[.]"

■ Section 473.444 does not violate the due process clause of the Missouri or United States Constitutions because it is a self-executing statute of limitation and does not involve sufficient state involvement to implicate due process protection. *State ex rel. Houska v. Dickhaner*, 323 S.W.3d 29, 32–33 (Mo. banc 2010). Further, in *Hatfield v. McCluney*, 893 S.W.2d 822, 824–27 (Mo. banc 1995), the Supreme Court of Missouri held that section 473.444 was effective to bar a claim by a judgment creditor against the estate filed more than one year after the decedent's death even when letters testamentary were not issued until the first anniversary of the decedent's death where the creditor independently knew of the decedent's death and knew the decedent owned assets at her death.

■ Similarly to *Hatfield,* Consolidated through its employees was aware of George's death shortly after George died, but never filed its claim for a noncontractual obligation to prevent unjust enrichment in George's probate proceeding. We also note that Mark informed Consolidated he did not intend to fulfill his father's contracts that are at issue in this case more than one month before the one-year

---

7. The issue of whether this was a personal contract that survived George's death was not addressed by the parties at the trial level and is not before us.

anniversary of his father's death. As a result, Consolidated's unjust enrichment claim is barred by section 473.444 against George's probate estate and against Mark in his capacity as heir.[8]

■ We also note that Consolidated had the burden to prove its unjust enrichment claim, and one of the elements of an unjust enrichment claim is that the plaintiff conferred a benefit on the defendant. *Johnson,* 334 S.W.3d at 474. The seven contracts for delivery of crops at issue in this case were, and remained, wholly executory as neither party performed any of the acts the party was obligated to perform under the contracts. Consolidated conferred no benefit on George Hobbs, his probate estate, or his heirs under the contracts, and failed to prove its unjust enrichment claim.

We reverse the trial court's judgment in favor of Consolidated on Consolidated's claim of unjust enrichment.

*Grant of Relief for Fraud under*
*Section 472.013*

The trial court also ruled that Consolidated was entitled to judgment against Mark Hobbs because Mark committed fraud in connection with his father's probate estate under section 472.013. Section 472.013 provides in relevant part:

> [w]henever fraud has been perpetrated in connection with any proceeding or in any statement filed under [the probate]

code, or if fraud is used to avoid or circumvent the provisions or purposes of [the probate] code, any person injured thereby may obtain appropriate relief against the perpetrator of the fraud or restitution from any person, other than a bona fide purchaser, benefitting from the fraud, whether innocent or not.

■ Section 472.013 expressly requires that the plaintiff be "injured" by the fraud. Further, under applicable case law, fraud, whether actual or constructive based on a breach of a fiduciary duty, requires an injury caused by the fraud to be actionable. *See In re Estate of Caldwell,* 794 S.W.2d 257, 263–64 (Mo.App. E.D.1990) (indicating that the elements of actual fraud under section 472.013 include reliance on the truth of a representation and "injury"); *Matter of Estate of Snyder,* 880 S.W.2d 596, 597, 600 (Mo.App. E.D.1994) (indicating a breach of a fiduciary duty as a personal representative of a decedent's estate is a constructive fraud under section 472.013); *Western Blue Print Co., LLC v. Roberts,* 367 S.W.3d 7, 14–15 (Mo. banc 2012) (indicating that the elements of breach of fiduciary duty when asserted as a tort claim include that "the breach caused the proponent to suffer harm").

■ The trial court concluded that Mark Hobbs defrauded Consolidated under section 472.013 by omitting significant assets from the inventory filed in his father's probate proceeding. However, the

---

8. Statutes of limitation apply to equitable claims as well as legal claims. *See North v. Hawkinson,* 324 S.W.2d 733, 742–45 (Mo. 1959) (applying a predecessor of 473.360 to bar an equitable claim); *Janes v. Janes,* 242 S.W.3d 744, 749 (Mo.App. W.D.2007) (noting that the doctrine of laches generally will not bar a suit before the running of an applicable statute of limitation in the absence of special facts because "equity may not disregard a statutory provision, for where the legislature has enacted a statute that governs and deter-

mines rights of the parties under certain circumstances, equity, as much as the law, is bound thereby") (internal quotation marks omitted); *Kuenzle v. Missouri State Highway Patrol,* 865 S.W.2d 667, 668–69 (Mo. banc 1993) (noting, in the context of a suit for equitable expungement of a closed arrest record and a statute that permitted the use of closed arrest records for some purposes, that "[w]here a statute clearly defines the rights of parties, the statute may not be unsettled or ignored").

uncontested evidence was that Consolidated never viewed the inventory until after the one-year statute of limitations under section 473.444 for filing claims in the probate proceeding had run. The uncontested evidence further showed that the inventory that was filed in the probate proceeding listed sufficient assets to pay Consolidated's claim in full had the claim been filed timely. Lastly, as counsel for Consolidated acknowledged at oral argument, the evidence showed that Consolidated failed to file a claim in the probate proceeding not because of anything Mark Hobbs did but because Consolidated did not understand that the law required it to file a claim in the probate proceeding.

In these circumstances, Consolidated failed to prove it relied on the truth of the inventory filed by Mark Hobbs in his father's probate proceeding, or that it was injured by its reliance or by any breach by Mark of his fiduciary duty as personal representative of his father's estate.

We reverse the trial court's judgment in favor of Consolidated under section 472.013.

*Grant of Relief for Common Law Fraud*

The trial court further ruled that Consolidated was entitled to judgment against Mark Hobbs because Mark committed common law fraud in that Consolidated "reasonably relied on Mark's delivery of Hobb's grain under [contracts that are not at issue in this case] until after the claims bar date," and that "Mark never intended to perform the contracts [at issue in this case] from shortly after George's death."

 The elements of common law fraud include, among other elements, (1) a representation by the defendant that is false, (2) the plaintiff's reliance on the truth of the representation, (3) the plaintiff's right to rely on the truth of the representation, and (4) injury to the plaintiff proximately caused by the reliance. *Next Day Motor Freight, Inc. v. Hirst,* 950 S.W.2d 676, 679 (Mo.App. E.D.1997). A promise is not a representation unless the promisor did not intend to perform when the promise was made, or made the promise with reckless disregard of whether he could perform. *Urologic Surgeons, Inc. v. Bullock,* 117 S.W.3d 722, 726 (Mo.App. E.D.2003).

 The trial court did not identify a specific false representation that Mark made, and the uncontested evidence shows that Mark made no representation or promise to Consolidated with respect to the performance of his father's contracts that are at issue in this case. Indeed, at the start of the trial, counsel for Consolidated acknowledged to the trial court that Consolidated was not alleging that Mark Hobbs "reached" an agreement to satisfy his father's outstanding contracts to deliver wheat, soybeans, and corn to Consolidated.

 The most that can be inferred from the trial court's judgment is that Mark's performance of one or more of his father's contracts that are not at issue in this case constituted a false representation or promise that he would perform his father's other, separate contracts that are at issue in this case. The short answer to this inference is that Mark's performance of one contract represents or promises nothing about his intention to perform another separate contract. Further, there was nothing false about Mark's performance of the contracts he did perform.[9]

---

9. Mark had no legal duty to inform Consolidated of his intentions with respect to fulfilling his father's contracts at issue in this case.

As a result, his undisclosed intentions are not actionable in the absence of a false representation. *Borgschulte v. Bonnot,* 285 S.W.3d

Moreover, as previously noted, counsel for Consolidated acknowledged that the evidence showed that Consolidated failed to file a claim in George's probate proceeding not because of anything Mark did but because Consolidated did not understand that the law required it to file a claim in the probate proceeding. As a result, Consolidated did not forego filing a claim in George's probate proceeding in reliance on any representation or promise by Mark that he would perform his father's contracts that are at issue in this case, and any such reliance did not cause Consolidated's injury.

Lastly, in view of the fact Mark's performance of one contract represents or promises nothing about his intention to perform another separate contract, Consolidated, even if it had done so, would not have had a right to rely on Mark's performance of contracts that are not at issue in this case.

We reverse the trial court's judgment in favor of Consolidated based on common law fraud.

In view of our reversal of all grounds on which the trial court ruled in Consolidated's favor, it is unnecessary to address Mark Hobbs' claim that the trial court also erred in awarding attorney fees to Consolidated. The trial court's award of attorney fees to Consolidated is reversed, and Consolidated's motion in this Court for attorney fees on appeal is denied, because Consolidated did not prevail on any ground before the trial court.

### Consolidated's Appeal

In its sole point relied on, Consolidated challenges the trial court's denial of Consolidated's claim that George and Mark were partners, and Mark was liable as a

partner on his father's contracts at issue in this case.

In *Winslow v. Nolan,* 319 S.W.3d 497, 501–02 (Mo.App. E.D.2010), the Eastern District of this Court stated:

A partnership is judicially defined as a contract of two or more competent persons to place their money, effects, labor and skill, or some or all of them, in lawful commerce or business and to divide the profits and bear the loss in certain proportions. The law never presumes the existence of a partnership, but he who asserts its existence has the burden of showing such existence. The plaintiff bears the burden of proof of presenting cogent, clear, and convincing evidence that the parties entered a definite and specific partnership agreement. A partnership agreement may be either oral or written, verbally expressed or implied from the acts and conduct of the parties themselves.

(internal citations and quotations omitted). Further, "the intention of the parties is the primary criterion in deciding whether a partnership exists." *Nesler v. Reed,* 703 S.W.2d 520, 523 (Mo.App. E.D.1985).

Mark Hobbs strongly contested the existence of a partnership with his father and there was evidence that Mark and his father did not intend or desire to operate as a partnership. In the absence of uncontested facts that entitle a party who bears the burden of proof (i.e., Consolidated on this issue) to judgment as a matter of law, the opposing party (i.e., Mark Hobbs on this issue) is not required to present any evidence to prevail because, once a fact is contested, the trial court is free to disbelieve any, all or none of the evidence related to that fact. *Pearson v. Koster,* 367 S.W.3d 36, 44, 52, 53, 54–55

---

345, 349 (Mo.App. S.D.2009) (silence or concealment of facts can amount to a "misrepre-

sentation" if the silent party has a duty to speak).

(Mo. banc 2012); *see also Pearson v. Koster,* 367 S.W.3d at 68–70 (Fischer, J., concurring). As a result, the trial court was free to disbelieve Consolidated's evidence of the existence of a partnership, and deny Consolidated's request for relief on this ground. Consolidated failed to meet its burden to persuade the trial court that a partnership existed.

Consolidated's point relied on is denied, and the trial court's judgment denying Consolidated's request for relief on this ground is affirmed.

GARY W. LYNCH, P.J. and WILLIAM W. FRANCIS, JR., J., concur.